UNITED STATES of America,
Plaintiff-Appellee,

v.

Nicholas SAND, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert Timothy SCULLY,
Defendant-Appellant.

Nos. 74–2012, 74–2338.

United States Court of Appeals,
Ninth Circuit.

Sept. 13, 1976.

Rehearing Denied in No. 74–2338
Oct. 8, 1976.

William L. Osterhoudt (argued), of Singer & Osterhoudt, San Francisco, Cal., for defendant-appellant in No. 74–2012.

James F. Hewitt, Atty. (argued), of Federal Public Defender, San Francisco, Cal., for defendant-appellant in No. 74–2338.

Malcolm Segal, Asst. U. S. Atty. (argued), of San Francisco, Cal., for plaintiff-appellee in No. 74–2012.

John M. Younquist, Asst. U. S. Atty. (argued), of San Francisco, Cal., for plaintiff-appellee in No. 74–2338.

Before DUNIWAY and GOODWIN, Circuit Judges, and BURNS,* District Judge.

DUNIWAY, Circuit Judge:

Decision in this case has been deferred pending decision by the Supreme Court in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71, decided April 21, 1976. We now submit the case and decide it.

Nicholas Sand was charged in two counts with income tax evasion, in one count with conspiracy to violate federal drug laws relating to lysergic acid diethylamide (LSD), in one count with conspiracy to defraud the United States in the collection of taxes, and in two counts with substantive drug violations, the manufacture and distribution of LSD. Robert Timothy Scully was charged in one count with income tax evasion, in the same two conspiracy counts as Sand, and in three drug related counts, one charging the manufacture and two the sale of LSD. The defendants were tried before a jury together with Lester Friedman, who was acquitted, and thus is not a party to this appeal. Sand was convicted of one count of tax evasion, both counts of conspiracy, and one count of manufacturing LSD. The remaining charges either resulted in acquittals or were dropped after the jury reported that it was unable to reach a verdict. Scully was convicted on all counts except the substantive tax evasion charge on which the jury was deadlocked. That count was dismissed after the United States Attorney filed a *nolle prosequi.* The trial court pronounced five consecutive sentences against Scully totalling 20 years imprisonment and a $10,000 fine. Sand received consecutive sentences totalling 15 years imprisonment and a $5,000 fine. Both appeal, claiming numerous errors. They also urge that we vacate the sentences and remand for resentencing. We affirm.

This case concerns money and drugs. More specifically, it concerns the manufacture and sale during 1968, 1969, and 1970 of a psychotropic organic compound, which the defendants claim was the licit chemical N–acetyl lysergic acid diethylamide (ALD–52) and which the government asserts was LSD, a controlled substance under 21 U.S.C. § 812 (Schedule I), and the nonreporting of income derived from this activity. The crux of Sand's and Scully's defense was that the substance they manufactured neither was controlled nor involved a controlled substance as a precursor,[1] and that the income not reported was not theirs, but

---

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

1. A precursor is a substance produced at any intermediate stage of production from which an end product is derived. In common experience, for example, dough is a necessary precursor of bread. Proof that the final product exists by necessity implies the existence at some point of the intermediate precursor. The defendants faced a dual problem in this case. First, the government charged them with manufacturing LSD as an end product. Second, it asserted that even if ALD–52 were the intended end product, it was essential to manufacture LSD first in order to produce ALD–52. The government could obtain a conviction on either

belonged to the government's chief witness, William Hitchcock. Such additional facts as are pertinent will appear in the following discussion.

## I.  *Pre-Indictment Delay.*

The defendants made timely motions to dismiss the charges against them because of pre-indictment delay.  *See* Fed.R.Crim.P. 12(b)(2), 48(b).  They claim that the passage of three years between the commission of the crimes and the commencement of prosecution deprived them of due process rights guaranteed by the Fifth Amendment.

■  "[T]he applicable statute of limitations . . . is usually considered the primary guarantee against bringing overly stale criminal charges."  *United States v. Ewell,* 1966, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627.  However, the Due Process Clause of the Fifth Amendment may require dismissal of the indictment if the defendant is able to demonstrate either that the delay was the product of deliberate action by law enforcement officials to gain a tactical advantage over the defendant, or that it resulted in such substantial prejudice to the accused that a fair trial is no longer possible.  *United States v. Marion,* 1971, 404 U.S. 307, 324–25, 92 S.Ct. 455, 30 L.Ed.2d 468 (dictum);  *United States v. Erickson,* 9 Cir., 1973, 472 F.2d 505, 507.

■  The *sine qua non* of a successful motion to dismiss a prosecution for pre-indictment delay is a demonstration that delay occurred, and "delay" in that context is not always easy to define.  However, we need not linger over this phase of the problem.  Even assuming that, as defendants argue, the United States could have secured an indictment in January, 1972, but waited until April, 1973, the defendants have not shown that this fifteen-month delay was the result of prosecutorial misconduct, or caused actual prejudice.

■  The district court hearing on the motion to dismiss dealt solely with the question of prejudice.  This is understandable, for as defendants noted in one of their pre-trial memoranda, the allegation that the delay was wilful was "implicit" in their moving papers.  In general we require that a party do more than suggest or imply an objection in order to preserve it on appeal.  However, because the record is sufficiently clear to allow us to examine and reject this contention on the merits, we abjure basing our decision upon procedural technicalities.

■  The district court's finding of no prejudice will not be reversed absent a showing that it was clearly wrong.  *United States v. Parish,* 1972, 152 U.S.App.D.C. 72, 468 F.2d 1129, 1136, *cert. denied,* 1973, 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690.  We conclude that it was not.

Defendants name thirteen persons whose testimony, they claim, would have been exculpatory.  Of this group, two died before January, 1972, and could not have testified even if the indictments had been returned when defendants say that they should have been returned.  Three died after January, 1972.  Defendants have attributed the non-appearance of only one of the eight still living to the pre-indictment delay and the link is, at best, weak.  Michael Randall, an indicted co-conspirator, was a fugitive at the time of trial from another, but unrelated, federal indictment returned during the period of alleged delay.  Thus, of the thirteen possible witnesses, the non-appearance of at most four is attributable to the delay.  Even assuming that all four would have appeared, it is not clear that their testimony would more likely have been helpful than harmful to Sand and Scully.  The burden of so showing was defendants'.  The district court agreed with the government that these witnesses probably would have been concerned with the consequences of their own involvement in these enterprises and would not have incriminated themselves in order to exculpate defendants. We can hardly say that that conclusion was erroneous.

theory.  The defendants argued that they had devised a method of producing ALD–52 without passing through an intermediate stage in which LSD was produced, and disputed that LSD was an intended final product.

Defendants also claim that the delay caused a loss of physical evidence, *i. e.,* the hydrolysis of the licit compound ALD–52 into illegal LSD.[2] Whatever prejudice defendants suffered was a product of their own negligence. Experienced chemists like Sand and Scully knew, or should have known, that burying a substance in an unsealed container is an ideal way to promote, not prevent, hydrolysis. If they were manufacturing a legal but perfect substitute for LSD, it was their obligation, not that of the government, to preserve evidence of that accomplishment. Having failed to do so, they cannot now complain because the ALD–52 might have been better preserved had the government indicted earlier.

The argument that the government deliberately delayed the indictment to gain a tactical advantage is without any support in the record. The mere passage of time in a conspiracy of this complexity has little probative value. *United States v. Manning,* 9 Cir., 1974, 509 F.2d 1230, 1234. The drug case involved laboratories in California, Missouri, and possibly in Europe. The tax case involved the transfer of cash from the United States through secret accounts in the Bahamas to other secret accounts in Switzerland. That government agents failed to grasp quickly the existence or scope of the enterprise is hardly surprising. Moreover, the only reason even suggested by defendants for the delay—waiting for the ALD–52 to hydrolyze to LSD—is implausible at best. The government maintained below, and argues here, that ALD–52 cannot be produced without first manufacturing LSD. Hence, from its point of view, delay would have served no purpose as proof of making ALD–52 would have sufficed.[3] The government argues that it did not have sufficient evidence to indict until Hitchcock agreed to testify against Sand and Scully. In contradiction, the defendants offer only their unsupported conclusory allegations. That is simply insufficient. *United States v. Griffin,* 9 Cir., 1972, 464 F.2d 1352, 1355, *cert. denied,* 409 U.S. 1009, 93 S.Ct. 447, 34 L.Ed.2d 302.

## II. *Refusal to Suppress Bank Records.*

■ Both defendants sought to exclude Sand's bank records which the government obtained from several banks by using civil tax summonses. The crux of their objections was that the IRS investigation was from its inception criminal and that the use of IRC § 7602 summonses in aid of a solely criminal investigation was improper, citing *Donaldson v. United States,* 1971, 400 U.S. 517, 531–36, 91 S.Ct. 534, 27 L.Ed.2d 580. However, the Court held in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), that a depositor has no standing to challenge an IRS summons directed at his bank. *Id.* at 445, 96 S.Ct. 1619. Hence, the district court was correct in denying the motion to suppress.

## III. *Taint Hearing.*

Sand and Scully assign several errors in the manner in which the district court conducted its suppression hearing. First, they contend that they were not given the opportunity, guaranteed them by *Alderman v. United States,* 1969, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, to demonstrate that evidence that the government used against them, not itself illegally obtained, was discovered through the exploitation of an illegal search. *See Wong Sun v. United States,* 1963, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441. Second, they argue that they showed a sufficient nexus between the evidence illegally obtained and that which they sought to suppress to compel the government to come forward to demon-

---

**2.** We do not imply that the district court was compelled by the evidence before it to conclude that the chemical offered at trial ever was ALD–52. The government produced substantial contrary evidence upon which the district court could properly have relied in denying the motion to dismiss.

**3.** That the government's chemists may have been wrong in believing that ALD–52 could not be produced without LSD does not, of course, have any probative value in an inquiry directed at state of mind.

strate lack of taint. Finally, they claim that the district court improperly deferred the question of taint to a post-trial hearing which was never held.

■ The record does not support the first and third contentions. The district court held a lengthy suppression hearing which consumed the better part of three days. The question of taint was repeatedly raised and resolved either by a ruling from the bench or by a concession by one of the parties. Contrary to the defendants' statements in their briefs before this court, the district judge did not defer to a post-trial hearing questions of taint which could have been resolved earlier.[4] The court simply stated that although the defendants had not demonstrated a sufficient connection between a prior illegal search and the evidence sought to be suppressed, the matter could be raised anew if evidence of taint appeared during the trial.

■ No post-trial hearing was held, but defendants did not ask for such a hearing. They seize upon an entry on the docket sheet as evidence that they renewed their motion for a suppression hearing after the jury was dismissed. It states:

> March 8  ORD: deft SAND pres for judgt; mos. for new trial & for taint hrg— DENIED.

An examination of defendants' moving papers and the oral argument in the district court shows that the only Fourth Amendment issues raised after the verdict were directed at either the use by the IRS of civil tax summonses to obtain information from defendants' banks, see supra, or the sufficiency of the government's affidavits denying electronic surveillance, a point not renewed on appeal. We are compelled to agree with the government that the defendants made no motion for a post-trial taint

hearing. An erroneous entry on a docket sheet cannot alter that fact.

Defendants' main contention is that they came forward with sufficient evidence to shift to the government the burden of demonstrating that its evidence was untainted. *Alderman v. United States, supra,* 394 U.S. at 183, 89 S.Ct. 961; *United States v. Polizzi,* 9 Cir., 1974, 500 F.2d 856, 910, cert. denied, 1975, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820. The defendants did not at trial, and do not on this appeal, identify particular items which should have been analyzed for taint. Rather, they argued that "there has been so much illegality that the presumption of regularity of the Government should lapse; [it] should have the burden of going forward and justifying [its] sources." We cannot agree.

■ In essence defendants ask that in cases in which unlawful police activity has reached a certain threshold level they be relieved of demonstrating a nexus between the evidence sought to be suppressed and other evidence illegally seized. We find this approach inconsistent with *Alderman* and our decision in *United States v. Polizzi, supra.* Both cases involved electronic eavesdropping, police activity which not only invades closely-guarded privacy interests, but may also be extremely productive. *See Berger v. New York,* 1967, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040, and Mr. Justice Douglas' concurring opinion, *id.* at 64–68, 87 S.Ct. 1873; S.Rep. No. 1097, 90 Cong., 2d Sess., 2 U.S.Code Cong. & Admin. News pp. 2112, 2153–63 (1968) (majority views on Title III of the Omnibus Crime Control and Safe Streets Act); pp. 2224–27, 2229–33, 2241–43 (minority views). In the case at bar there were three illegal seizures, but there was no wiretapping. To hold now that *Alderman* does not apply when illegal government surveillance is extensive would be to ignore the history and logic of that

---

4. We, therefore, need not determine whether it would have been an abuse of discretion for the district court to have postponed the taint hearing until after trial. *See United States v. Sac-*

*co,* 9 Cir., 1970, 428 F.2d 264, 273–74, cert. denied, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140.

opinion.[5] As a practical matter, the ease of showing a nexus between contested items and evidence obtained by unlawful activity may increase substantially as the number and scope of Fourth Amendment violations increase. But, this does not imply that the procedures for determining taint should vary depending upon whether the police are guilty of many or few transgressions.

In the alternative, defendants argue that they produced sufficient evidence to trigger a hearing into whether "illegally secured information [led] the government to substantially intensify an investigation [making] all evidence subsequently uncovered [a product] '. . . of that illegality.'" *United States v. Schipani,* E.D.N.Y., 1968, 289 F.Supp. 43, 62, *affirmed,* 1969, 414 F.2d 1262, *cert. denied,* 1970, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102. That is not the law in this circuit or any other.[6] *United States v. Brandon,* 9 Cir., 1972, 467 F.2d 1008, 1010; *United States v. Bacall,* 9 Cir., 1971, 443 F.2d 1050, 1056–57, *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557. "[T]o grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be would stretch the exclusionary rule beyond tolerable bounds." *United States v. Friedland, supra,* 441 F.2d at 861 (Friendly, J.). It would also be a misapplication of *Wong Sun* in which the Court refused to hold inadmissable defendant Wong Sun's confession, made several days after his release, despite the fact that the police would not have interrogated Wong Sun but for the arrest. "[T]he connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" 371, U.S. at 491, 83 S.Ct. at 419.

█ Whether there would have been an investigation of Sand and Scully had there been no unlawful searches in Colorado or Missouri is similarly of no consequence. Absent a showing, which defendants did not make, that the government utilized illegally secured information to obtain more than defendants' identities, there is no violation of the Fourth Amendment.

## IV. Swiss Bank Records.

The district court admitted a large volume of business records from the Paravicini Bank of Berne, Switzerland. These records, introduced by the government, were authenticated by Eugene Patry, a bank vice-chairman.[7] The defendants have raised numerous objections which we consider seriatim.

Their first argument is that the documents were not authenticated in the manner prescribed by 18 U.S.C. §§ 3491–96. The substance of the contention is that these statutes require that foreign business records not only be authenticated in accordance with 28 U.S.C. § 1732 (since replaced by Fed.R.Evid. 803(6)), but also be certified as genuine by an American consular officer. This is incorrect.

---

**5.** *See United States v. Butenko,* 3 Cir., *in banc,* 1974, 494 F.2d 593, 615–20 (Aldisert, J., concurring), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121, which contains the fullest exposition of the facts in *Alderman.*

**6.** "It seems not to be sufficiently realized that the *holding* of the district court in *Schipani,* 289 F.Supp. 43 (E.D.N.Y.1968), which we affirmed, was that the Government had met its burden of showing by preponderance of the evidence that it would have launched the saturation investigation which developed the evidence leading to Schipani's conviction even if no information had been received from illegal electronic surveillance of a travel bureau. It was with respect to this—not to everything *said* in the course of a 22-page opinion by the district judge—that Judge Jameson, writing for the court, 'approve[d] the legal principles applied,' 414 F.2d at 1266."

*United States v. Cole,* 2 Cir., 1972, 463 F.2d 163, 172, *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (footnote omitted); *accord, United States v. Friedland,* 2 Cir., 1971, 441 F.2d 855, 860, *cert. denied,* 404 U.S. 867, 914, 92 S.Ct. 143, 30 L.Ed.2d 111.

**7.** Patry was actually an officer of the Metropolitan Bank which was the name adopted by the Paravicini Bank shortly after its reorganization in 1971. We regard Metropolitan and Paravicini as one and the same entity.

■ Sections 3491 *et seq.* do not establish any additional requirement; rather, they provide an alternative method by which foreign documents may be authenticated. The last sentence of § 3491 reads:

Nothing contained herein shall be deemed to require authentication under the provisions of section 3494 of this title of any such foreign documents which may otherwise by properly authenticated by law.

The proviso can have but one meaning— that proponents of foreign business records may continue to authenticate the document by testimony in court instead of using the "short-cut" provided by §§ 3491-96.

■ Next, the defendants argue that the government did not authenticate in the manner prescribed by 28 U.S.C. § 1732. As we have held, the person testifying need not have personal knowledge of the contents of the document. *United States v. Saputski,* 9 Cir., 1974, 496 F.2d 140, 142. Neither is it necessary that the witness personally know the time, place, and manner in which the record was made. *United States v. Leal,* 9 Cir., 1975, 509 F.2d 122, 127; *United States v. Saputski, supra,* 496 F.2d at 142; *United States v. Cotter,* 2 Cir., 1932, 60 F.2d 689, 693. The government made a sufficient showing of the authenticity of the records through Patry's testimony.

■ Finally, defendants assert that: Paravicini Bank records introduced by the government were so inherently unreliable and so incomplete that their admission amounted to an abridgement of appellant's Sixth Amendment rights to confront the witnesses against them. [Brief, p. 75.]

We have consistently rejected Sixth Amendment challenges to 28 U.S.C. § 1732. *United States v. Leal, supra,* 509 F.2d at 127; *United States v. Haili,* 9 Cir., 1971, 443 F.2d 1295, 1298. The argument is not strengthened by combining it with an allegation that the records are incomplete or inaccurate. Even if this were true, § 1732 itself provides that it would affect only the weight, not the admissibility of the proffered evidence. *See Hanley v. United States,* 5 Cir., 1969, 416 F.2d 1160, 1167-68 & n. 14, *cert. denied,* 1970, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91.

### V. *Co-Conspirators' Statements.*

Defendants take the unusual position of urging the admissibility of declarations of co-conspirators which the government seeks to exclude. They argue that the co-conspirator exception has force of its own based upon agency principles and is not an extension of the admissions exception to the hearsay rule. Thus they ask us to hold that a co-conspirator's declaration can be introduced by either party and may be used to exculpate as well as inculpate the accused. We rejected this argument in *Wolcher v. United States,* 9 Cir., 1956, 233 F.2d 748, 750, *cert. denied,* 352 U.S. 839, 77 S.Ct. 61, 1 L.Ed.2d 56.

### VI. *Use of Suppressed Evidence to Impeach.*

■ The prosecution's threat to use illegally seized evidence to impeach defendants' testimony was not an impermissible restraint on their constitutional right to testify on their own behalf. The Supreme Court's holdings in *Harris v. New York,* 1971, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, and *Walder v. United States,* 1954, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503, are controlling on this point.

■ Whether the government may use evidence unlawfully seized from the defendant to impeach the testimony of a non-defendant witness is an issue not resolved by *Walder* and its progeny. The question arises here in unique circumstances. The government called as its own witness one Matthews, an attorney who had once represented defendant Scully, to document cash transactions concerning his former client which were relevant to the tax case. Realizing that Matthews was a friendly witness, Scully's counsel during cross-examination secured the statement that "I never had the impression, when I represented Tim Scully,

that he was ever doing anything illegal." On re-direct the government, over the objection of all defense counsel, questioned Matthews on the nature of his representation of Scully. Matthews replied that Scully had been charged with manufacturing LSD, gratuitously adding, "the trial was a success. You know, the whole thing was thrown out." Even if we were to conclude that mention of a prior prosecution based on illegally seized evidence was a use of that evidence, we must conclude that in this circumstance any error was harmless beyond a reasonable doubt.

### VII. *Sentence Review.*

While harsh, the sentences meted out to Sand and Scully were less than the maximum; hence, the scope of our review is limited almost to the vanishing point. *United States v. Tucker*, 1972, 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592; *United States v. See*, 9 Cir., 1974, 505 F.2d 845, 857, *cert. denied*, 1975, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673; *United States v. James*, 9 Cir., 1971, 443 F.2d 348, 349.

However, the district court's discretion is not so totally unlimited that it can rely upon improper or inaccurate data in reaching its sentencing decision. *See United States v. Weston*, 9 Cir., 1971, 448 F.2d 626, 628–33, *cert. denied*, 1972, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749. Defendants argue that this occurred here, because the district judge considered only deterrence and not rehabilitation as a legitimate function of the criminal law. *See Briscoe v. United States*, 1968, 129 U.S.App.D.C. 146, 391 F.2d 984, 986–87.

The defendants' statement of facts is incorrect. Hence, we need not consider whether a district judge must consider the possibility of rehabilitation in passing sentence. The judge did consider, albeit disparagingly, the rehabilitative role of the criminal law, but concluded that these defendants were unrehabilitatable. It is of no moment that we might have reached a different conclusion; it is not our function to

substitute our judgment for the district court's. *United States v. Tucker, supra*; *United States v. See, supra*; *United States v. James, supra*. The most that we can do is to suggest that the district judge, if a motion for reduction of sentence is made under Fed.R.Crim.P. 35, should examine the record and defendants' conduct since the trial in ruling on the motion.

Affirmed.