**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 32368**

STATE OF IDAHO,

        Plaintiff-Respondent,

v.

RICHARD LEE McBAINE,

        Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

**2007 Opinion No. 17**

**Filed: March 22, 2007**

**Stephen W. Kenyon, Clerk**

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Michael E. Wetherell, District Judge.

Order denying motion to suppress evidence, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Elizabeth A. Allred, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

Richard Lee McBaine appeals from the district court's order denying his motion to suppress evidence found in a search of his home that was conducted pursuant to his oral and written consents. The issue presented is whether McBaine's consents were tainted by an earlier unlawful entry of the home by a police officer.

**I.**

**BACKGROUND**

Ada County Deputies Ron Santucci and Cliff Exley were dispatched to McBaine's residence at approximately 7:18 p.m. in response to a report from an unidentified caller that McBaine was manufacturing methamphetamine in his home. Deputies arrived at the trailer park where McBaine's residence was located at about 7:39 p.m. and made contact with fourteen-year-old J.L. who was standing outside and who identified herself as the calling party. J.L. told the deputies that she had called about the "meth lab" at the request of thirteen-year-old K.Q., who

1

was concerned because her stepfather "had some kind of lab or was making drugs in their house." K.Q. lived with her five-year-old sister, A.Q., her mother, Rosa Quinton, and her mother's boyfriend, McBaine. Deputies Santucci and Exley then went to McBaine's residence to investigate.

When the deputies knocked on McBaine's door, he came outside to speak to them. When McBaine opened the door, Deputy Santucci could see a female, later identified as Quinton, standing inside. Deputy Santucci told Quinton he would like to come inside and talk to her. McBaine responded that he would prefer they talk to Quinton outside. Deputy Santucci said he would rather speak to Quinton separately. Neither McBaine nor Quinton gave Santucci permission to enter, but he nevertheless stepped four or five feet inside the trailer to where Quinton was standing. K.Q. and A.Q. were also inside, seated on a sofa, near Quinton.

While Deputy Exley was interviewing McBaine outside, Deputy Santucci told Quinton they were investigating a report of a meth lab and they were worried about the children living in that environment. Quinton denied the existence of a lab. Deputy Santucci then asked K.Q. to come outside with him, which she did. Once outside and away from Quinton and McBaine, K.Q. told Deputy Santucci that she had seen a meth lab in McBaine's and Quinton's bedroom, and she specifically identified some of the items she saw. K.Q. also said that McBaine had "been staying up all night cooking meth."

After speaking with K.Q., Deputy Santucci went back to talk to Deputy Exley and McBaine. Deputy Santucci told McBaine that they wanted to look inside the residence to make sure there was no meth lab, particularly because children should not be living in that environment. According to the deputies' subsequent testimony, which was accepted by the district court, McBaine gave the deputies oral consent to search the residence. During the search, however, the deputies were unable to gain access to McBaine's bedroom because the door was locked. McBaine said he had accidentally locked the bedroom door and could not get in. Because the officers were most interested in the contents of the master bedroom, Deputy Santucci contacted the narcotics supervisor for assistance. Detective Javier Bustos was sent to the scene, arriving at approximately 8:07 p.m.

2

Detective Bustos testified that he spoke with McBaine for approximately ten minutes, during which time he informed McBaine of his *Miranda*[1] rights and told him that, based on the information provided by the deputies, Bustos would attempt to obtain a search warrant or, alternatively, McBaine could allow access to the bedroom. McBaine then signed a written form giving consent to a search of the home, and he unlocked the bedroom door. A search of the room revealed evidence of a methamphetamine lab. McBaine admitted he had been "cooking" methamphetamine for approximately one year.

After the State charged McBaine with trafficking in methamphetamine, Idaho Code § 37-2732B(a), and manufacturing a controlled substance where children are present, I.C. § 37-2737A, he filed a motion to suppress the evidence found in his home. The district court denied the motion. McBaine thereafter pleaded guilty, reserving his right to appeal the order denying his suppression motion. On appeal McBaine argues that the evidence should have been suppressed because his consents to the search of his home were products of Deputy Santucci's initial unjustified entry and were involuntary.

## II.

## ANALYSIS

In reviewing a trial court's ruling on a motion to suppress evidence, we accept the trial court's findings of fact if they are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Abeyta*, 131 Idaho 704, 708, 963 P.2d 387, 391 (Ct. App. 1998).

### A.    Unlawful Entry

The sanctity and privacy of a home is protected by the Fourth Amendment's prohibition against unreasonable searches and seizures. Therefore, absent circumstances that fit within a recognized exception to the warrant requirement, evidence acquired through the warrantless search of a home must be suppressed. *State v. Revenaugh*, 133 Idaho 774, 776, 992 P.2d 769, 771 (1999); *State v. Johnson*, 110 Idaho 516, 522-23, 716 P.2d 1288, 1294-95 (1986).

Here, there were multiple entries into McBaine's home by officers. The first occurred when Deputy Santucci entered without permission and briefly spoke with McBaine's wife. This

---

[1]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

initial entry was unquestionably unlawful. Deputy Santucci entered without permission, and the State concedes on appeal that there is no exception to the warrant requirement that applies to this entry. The district court found that the later entries were made with McBaine's consent. A defendant's voluntary consent to a search relieves government agents of the warrant requirement. *State v. Lafferty*, 139 Idaho 336, 339, 79 P.3d 157, 160 (Ct. App. 2003); *State v. Fee*, 135 Idaho 857, 862, 26 P.3d 40, 45 (Ct. App. 2001). McBaine contends, however, that his oral and written consents to search the home were tainted by Deputy Santucci's earlier illegal entry, and therefore evidence found during the consent searches must be suppressed. We conclude that the evidence presented on McBaine's suppression motion shows no taint or causal link between Deputy Santucci's brief illegal entry and McBaine's subsequent consents, and therefore the unlawful intrusion does not require suppression of evidence found in the consent search.

The exclusionary rule calls for suppression of evidence that is gained through unconstitutional governmental activity. *Segura v. United States*, 468 U.S. 796, 815 (1984); *State v. Wigginton*, 142 Idaho 180, 184, 125 P.3d 536, 540 (Ct. App. 2005). This prohibition against use of derivative evidence extends to the indirect as well as the direct fruit of the government's misconduct. *Segura*, 468 U.S. at 804; *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Nevertheless, "[s]uppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.'" *Segura*, 468 U.S. at 815 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). That is, "evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Id.* Where a defendant has moved to suppress evidence allegedly gained through unconstitutional police conduct, the State bears the ultimate burden of persuasion to prove that the challenged evidence is untainted, but the defendant bears an initial burden of going forward with evidence to show a factual nexus between the illegality and the State's acquisition of the evidence. *Alderman v. United States*, 394 U.S. 165, 183 (1969); *Wigginton*, 142 Idaho at 184, 125 P.3d at 540; *State v. Babb*, 136 Idaho 95, 98, 29 P.3d 406, 409 (Ct. App. 2001). This requires a prima facie showing that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *Wigginton*, 142 Idaho at 184, 125 P.3d at 540 (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)). *See also Nardone v. United States*, 308 U.S. 338, 341 (1939). By expressing the query as a "but for" test, we do not imply that a defendant bears the burden to prove a negative--that the State would not or could not have discovered the

evidence on any set of hypothetical circumstances that could have arisen absent the illegal search. Rather, the defendant need only show that, on the events that did take place, the discovery of the evidence was a product or result of the unlawful police conduct.

Where a defendant has not shown the requisite nexus between the unlawful police activity and the challenged evidence, suppression must be denied. *Crews*, 445 U.S. 463. An illustrative case is *United States v. King*, 222 F.3d 1280 (10th Cir. 2000) where police conducted a "protective sweep" search of the defendant's house while arresting him. During the sweep, officers saw a shotgun. They returned later with a search warrant and conducted a search that yielded other weapons, drugs, and paraphernalia. The Tenth Circuit Court of Appeals held that even if the protective sweep violated the Fourth Amendment, the defendant had shown no factual nexus between this violation and the seizure of evidence in the subsequent search because the affidavit supporting the warrant application did not refer to the protective sweep or anything seen in the house during the sweep. The court also held that the defendant had shown no basis for suppression of his own incriminating statements because there was no demonstration of a factual nexus between the sweep and his admissions.

A similar case is *United States v. Sacco*, 563 F.2d 552, 558 (2nd Cir. 1977), where the government had illegally tapped the defendant's telephone. The defendant contended that various investigations into his criminal activities were a result of the illegal wiretap. The trial court found, however, that the government authorities had not used information from the wiretaps in the prosecution and the defendant had not met his initial burden of producing evidence demonstrating taint.

This Court's decision in *Wigginton*, although factually dissimilar, is also instructive. There, the defendant was stopped on suspicion of driving under the influence. The trooper made observations leading him to believe that Wigginton was intoxicated, and the officer could smell an overwhelming odor of alcohol coming from inside the vehicle. After Wigginton had passed field sobriety tests, the trooper informed him that the trooper was going to search the vehicle because, based on the strong odor coming from the car, there was probable cause to believe that the car held an open container of alcohol, in violation of Idaho law. During the course of the stop, a second officer arrived, accompanied by a drug detection dog. Before the officers began searching the vehicle, the second officer walked the drug dog around the vehicle and, at some point, the dog alerted to the presence of drugs. In searching the vehicle, the two officers found

5

ingredients and equipment commonly used in manufacturing methamphetamine. After being charged with a drug offense, Wigginton sought suppression of evidence found in the vehicle because, among other grounds, use of the drug dog illegally extended the length of the stop without reasonable suspicion of drug activity. This Court held that even if Wigginton's roadside detention was unlawfully lengthened by the use of the drug dog, suppression of items found in the vehicle was not appropriate because before the drug dog was employed, the officers already possessed probable cause to search the car for an open container, and the first trooper had already announced his intention to conduct the search. The interlude with the dog, we noted, only briefly delayed an already justified and planned search, and therefore Wigginton had demonstrated no factual nexus between the illegal conduct and the evidence that he sought to suppress. *Wigginton*, 142 Idaho at 184, 125 P.3d at 540. *See also United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980) (holding defendant had not established a connection or taint between illegally seized evidence, which was suppressed, and unsuppressed witness testimony); *United States v. Sand*, 541 F.2d 1370 (9th Cir. 1976) (holding defendants failed to show nexus between evidence acquired illegally and evidence gained by government through subsequent investigation); *Cruse v. State*, 584 P.2d 1141 (Alaska 1978) (no showing that evidence in search pursuant to a warrant was tainted by earlier illegal search of defendant's car trunk because officers were able to obtain the warrant based on evidence wholly independent of the unlawful search); *Powers v. State*, 440 N.E.2d 1096 (Ind. 1982) (no showing that search warrant was tainted by earlier illegal interceptions of telephone conversations by government informant); WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 11.2(b) at 49 (4th ed. 2004).

In McBaine's case, before officers even knocked on his door they were informed by J.L. that there was a methamphetamine lab in the residence. No evidence of any kind was gained during Deputy Santucci's unlawful intrusion. He did not then see, hear, smell or otherwise detect any evidence of the methamphetamine lab. Nor did this intrusion even make Santucci aware of the presence of witnesses Quinton and K.Q., both of whom were visible through the open door before he entered. From an evidentiary standpoint, his unlawful entry yielded nothing. During the brief intrusion, Deputy Santucci did not search for contraband and did not act in a threatening or overbearing manner, but merely spoke to Quinton momentarily before exiting. Santucci's intrusion apparently had ended before consent to a search was requested of McBaine.

6

Even if it could be said that Santucci's interview of K.Q. was somehow tainted or suppressible merely because Santucci was inside the home when he asked K.Q. to exit with him, there is no evidence that the officers used information from K.Q. in order to induce McBaine's consent to a search. According to the testimony at the suppression hearing, the officers merely informed McBaine that they "had information" that there was a methamphetamine lab in his home. This was information that the officers had already received from J.L. before they interviewed K.Q. There is no evidence that Santucci's conversation with K.Q., or with McBaine's wife inside the residence, was somehow exploited to secure McBaine's subsequent consent to a search.

McBaine's appellate counsel argues that McBaine's consent should be deemed tainted by the psychological effect of having seen an officer enter his home without permission. According to the argument, this could have led McBaine to conclude there was no point in resisting the officer's requests that he consent to a full search. The defect in this argument is that it bears no support in the evidence. To the contrary, the evidence shows that McBaine resisted the initial requests for access to his bedroom where the incriminating evidence was ultimately found. It was only after Detective Bustos arrived and told McBaine that the officers would attempt to obtain a search warrant if he would not give them access to the bedroom that he ultimately consented. Moreover, McBaine's own testimony at the suppression hearing contradicts his counsel's argument, for McBaine testified that he never consented at all to a search of his home. He claimed that it was his understanding when he signed the consent form that he was agreeing only to a search of his vehicle. There is thus an absence of any evidence to support the theory on appeal that McBaine's consent was a direct or indirect fruit of Deputy Santucci's initial brief, but illegal, intrusion.

McBaine's argument on appeal has focused entirely upon application of the "attenuation doctrine," which addresses circumstances where evidence derived from illegal police activity may not be subject to suppression. That doctrine requires a determination "whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *Crews*, 445 U.S. at 471. McBaine's argument misses the mark because, as we have held, here there was no "taint" to purge. As the United States Supreme Court has stated, "attenuation analysis is only appropriate where, as a threshold matter,

7

courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity.'" *New York v. Harris*, 495 U.S. 14, 19 (1990) (quoting *Crews*, 445 U.S. at 471). There being no tainted evidence here, there is no occasion for application of the attenuation doctrine.

**B.      Voluntariness of Consent**

McBaine may also be arguing that, quite apart from Deputy Santucci's unlawful entry, McBaine's consent to the search of his home was involuntary. Consent to a search will justify a warrantless search by law enforcement officers only if the consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Thus, the State must show that the consent was not the result of duress or coercion, either direct or implied. *Id.* at 248; *State v. Whiteley*, 124 Idaho 261, 264, 858 P.2d 800, 803 (Ct. App. 1993). Whether a consent to a search was voluntarily given is a question of fact to be determined from the totality of all the circumstances. *Schneckloth*, 412 U.S. at 227; *State v. Varie*, 135 Idaho 848, 852, 26 P.3d 31, 35 (2001). The State bears the burden to demonstrate the voluntariness of a consent. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *State v. Kilby*, 130 Idaho 747, 749, 947 P.2d 420, 422 (Ct. App. 1997). In a suppression hearing where voluntariness is an issue, the power to assess the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence, and draw factual inferences is vested in the trial court. *Abeyta*, 131 Idaho at 708, 963 P.2d at 391.

The district court's findings that McBaine's oral and written consents to search his residence were given freely and voluntarily are supported by substantial evidence in the record. In this regard, the trial court resolved all factual discrepancies in favor of the State's witnesses, including the issue of credibility. On appeal, McBaine argues no facts creating involuntariness other than Deputy Santucci's initial unlawful entry into McBaine's home. As we have held that the evidence shows no exploitation of that unlawful entry to gain McBaine's consent nor any other causal connection between the two, McBaine has shown no error in the trial court's determination that his consent was voluntary.

## III.

## CONCLUSION

We have found no error in the district court's disposition of McBaine's suppression motion. Therefore, the order denying the motion to suppress evidence is affirmed.

Judge GUTIERREZ **CONCURS.**

8

Judge Pro Tem SCHWARTZMAN, **SPECIALLY CONCURRING**

I concur wholeheartedly in the result reached by the majority. However, because the first consent to search followed almost immediately after the initial unlawful entry and interview with K.Q.,[2] I would engage in an "attenuation analysis" just to be on the constitutional safe side.

Whether a consent to search is voluntary under the Fifth Amendment is an entirely separate question from whether a consent to search is tainted by a prior Fourth Amendment violation. *See New York v. Harris*, 495 U.S. 14, 23 (1990); *Brown v. Illinois*, 422 U.S. 590, 599 (1975). Voluntary consent occurring after an unlawful warrantless entry does not automatically expunge the taint of the Fourth Amendment violation. *State v. Zavala*, 134 Idaho 532, 536, 5 P.3d 993, 997 (Ct. App. 2000). And consent to search will not expunge the taint of unlawful police conduct where the events are irrevocably intertwined. *State v. Kerley*, 134 Idaho 870, 874, 11 P.3d 489, 493 (Ct. App. 2000).

Once an illegality has been shown, a court must decide whether the evidence has come about by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *Id*. at 875, 11 P.3d at 494 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). Relevant factors include the presence of intervening circumstances, temporal proximity, and the purpose and flagrancy of the official misconduct. *Id*.; *see also United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004). Applying the above criteria to the facts established herein, I find that the subsequent incriminating evidence obtained in this case did not come about by exploitation of the illegal entry, but instead by means sufficiently distinguishable to be purged of any primary taint.[3]

The test for determining whether the primary taint of a prior constitutional violation has been purged is commonly referred to as an attenuation analysis or attenuation test, and advances the exclusionary rules "twin aims of deterrence and judicial integrity." *Washington*, 387 F.3d at 1072-73 (citing *Brown*, 422 U.S. at 599-600); *see also* Note, State v. Zavala: *Consent to Search*

---

[2]    Without the first-hand information provided by K.Q., the police would not have had sufficient reliable information to obtain a search warrant.

[3]    Although the district court did not engage in an inquiry as to whether the taint of the illegal entry had been purged, its findings and the record are sufficient to make such a determination so that remand would not be necessary. *Brown*, 422 U.S. at 604.

*as Attenuating the Taint of Illegal Searches and Seizures*, 38 IDAHO L. REV. 135 (2001). My attenuation analysis is compelled by the following facts and circumstances:

(1)    The officers were faced with a challenging situation in the field.  A fourteen-year-old caller notified the police that her thirteen-year-old friend was living in the same household where McBaine was allegedly manufacturing methamphetamine;

(2)    when McBaine answered the door and voluntarily spoke outside to one of the officers, the other officer could plainly see the mother just inside the threshold;

(3)    K.Q. and her young sister - both potential victims-were also seated on a sofa near the mother and were easily visible from the doorway;

(4)    the officer's "trespass" in crossing the threshold, while unlawful, was brief and the intrusion minimal, at worst a minor and technical invasion of McBaine's rights.  *See United States v. Seidman*, 156 F.3d 542, 549 (4th Cir. 1998).  The officer's intent was to contact and speak with a willing juvenile witness and her mother in a potentially volatile situation apart from the very adult whom the juvenile claimed was manufacturing methamphetamine in the same home in which she lived.  The entry was not made for the ulterior purpose of extracting a consent to search from McBaine;

(5)    no contraband evidence of any kind was observed or seized by the officer during this brief encounter;

(6)    the officer thereafter followed McBaine's request to talk outside with any of the other residents;

(7)    the general atmosphere was kept congenial and was not calculated to cause surprise, fright and confusion through a show of force; *Id.*; *compare Brown, 422 U.S. at 605*;

(8)    in effect, the officer could have achieved the same result by simply knocking on the open door and requesting the juvenile and her mother to accompany him outside to talk;

(9)    the integrity of the judicial system will not be compromised by denying suppression of evidence in this case.  The conduct of the police here does not rise to the level of purposeful or flagrant misconduct requiring prophylactic exclusion of evidence.  *See Rawlings v. Kentucky*, 448 U.S. 98, 110 (1980).

Accordingly, all of the state's subsequent evidence was attenuated and sufficiently distinguishable from the illegal entry so as to be fully purged of any primary taint.