# IN THE SUPREME COURT OF THE STATE OF IDAHO

## DOCKET NO. 47981

STATE OF IDAHO,

    Plaintiff-Appellant,

v.

JEREMY LEE HUNTLEY,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

**Boise, November 2021 Term**

**Opinion Filed: June 29, 2022**

**Melanie Gagnepain, Clerk**

---

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez Perce County. Jay P. Gaskill, District Judge.

The decision of the district court is <u>reversed</u>, and the cased is <u>remanded</u> for further proceedings.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Appellant. Justin Porter argued.

Eric D. Fredericksen, State Appellant Public Defender, for Respondent. Ben McGreevy argued.

---

BRODY, Justice.

This case involves an investigatory detention of Jeremey Lee Huntley based on a series of tips, corroborated in part, from a known confidential informant that Huntley was trafficking methamphetamine into Idaho. In the district court, Huntley moved to suppress the methamphetamine evidence found on his person and in his vehicle found during a search after the stop. The district court granted Huntley's motion after concluding the officers lacked reasonable suspicion for the stop and that it was unlawfully prolonged. The State appealed. We reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Huntley became the subject of a drug trafficking investigation based on tips from a paid

1

confidential informant ("the CI"). The investigation culminated in an investigatory stop of Huntley at his parked vehicle, a drug dog alert on his vehicle, and the discovery of methamphetamine on his person and in his vehicle.

Leading up to the stop, in early August 2019, the CI told Detective Brett Dammon of the Lewiston Police Department that Huntley was trafficking methamphetamine from Washington into the Lewiston, Idaho area. The CI provided Detective Dammon with Huntley's address in Lewiston and reported that Huntley drove a blue station wagon. Detective Dammon independently corroborated Huntley's address through a police department computer system. Later, at the suppression hearing, Detective Dammon testified that the CI had "been deemed to be reliable" and had "provided reliable and correct information" in past cases.

Still early in the month, on August 8, 2019, the CI called Detective Dammon and informed him that Huntley, at that time, "was out of the Lewis-Clark Valley possibly picking up methamphetamine" in Washington. The CI did not say how he knew this information. Later that night, the CI contacted Detective Dammon again by phone, and said he had just "met and spoken with" Huntley in Lewiston. The CI reported seeing Huntley "in possession of several ounces of methamphetamine" during the interaction.

Starting sometime the next morning, on August 9, 2019, Detective Dammon, along with two other detectives, surveilled Huntley's apartment complex. Later, around 2:30 p.m., the detectives saw Huntley exit the complex. Huntley was carrying a small child in a car seat, a black bag, and a large silver case. After leaving the complex, Huntley placed the child, bag, and case inside a blue station wagon. Huntley drove the station wagon away and the detectives followed him until he parked in another part of Lewiston. At this point, the detectives decided to stop Huntley at his parked vehicle to investigate him for illegal drug possession and trafficking.

While the other two detectives informed Huntley of their drug investigation against him, and read Huntley his *Miranda* rights, Detective Dammon called for a drug-detection dog. After making his call, Detective Dammon approached Huntley and asked him if he was in possession of any illegal drugs and whether he would consent to a search. Huntley responded no to both questions. After this, the three detectives, and Huntley, waited for approximately fifteen minutes before the drug-detection dog arrived and conducted an exterior sniff of Huntley's vehicle. At some point during the stop, a nearby family member retrieved the small child from Huntley's station wagon.

The drug-detection dog alerted on the exterior of the station wagon, and the detectives used the alert as probable cause to further detain Huntley while they applied for a search warrant. After obtaining the search warrant, detectives found methamphetamine on Huntley's person and roughly four ounces of methamphetamine inside the same large silver case that the detectives' previously witnessed Huntley place inside the station wagon. The detectives arrested Huntley for trafficking methamphetamine. After Huntley's arrest, the State charged Huntley with trafficking between 28 and 200 grams (roughly one to seven ounces) of methamphetamine, a felony under Idaho Code section 37-2732B(a)(4)(A), and added a persistent violator sentencing enhancement under Idaho Code section 19-2514.

After his arraignment, Huntley filed a motion to suppress the methamphetamine, arguing the illegality of the stop and the extension of the stop to wait for the drug-detection dog violated his constitutional rights under both the Fourth Amendment of the United States Constitution and Article I, Section 17, of the Idaho Constitution. The district court heard Huntley's motion and both parties examined Detective Dammon. Thereafter, on March 18, 2020, the district court issued a written decision granting Huntley's motion to suppress. Its decision relied on two independent grounds. First, the district court determined the stop was not supported by reasonable suspicion. Second, the district court determined the stop was unlawfully prolonged for fifteen minutes while waiting for the drug-detection dog to arrive.

The State timely appealed the district court's decision to this Court. Concerning the first ground, the parties agree the only issue is whether reasonable suspicion existed under the totality of the circumstances to stop Huntley.

## II. STANDARD OF REVIEW

When the Court reviews a district court's order granting a motion to suppress, the standard of review is bifurcated. *State v. Watts*, 142 Idaho 230, 232, 127 P.3d 133, 135 (2005). First, the Court will accept the district court's findings of fact unless they are clearly erroneous. *State v. Diaz*, 144 Idaho 300, 302, 160 P.3d 739, 741 (2007). "Findings of fact are not clearly erroneous if they are supported by substantial and competent evidence." *State v. Bishop*, 146 Idaho 804, 810, 203 P.3d 1203, 1209 (2009). Second, the Court freely reviews the district court's "application of constitutional principles in light of the facts found." *State v. Skurlock*, 150 Idaho 404, 405, 247 P.3d 631, 632 (2011). "Accordingly, this Court freely reviews the constitutionality of a search and seizure." *Bishop*, 146 Idaho at 810, 203 P.3d at 1209.

## III.  ANALYSIS

On appeal, the State argues the district court erred because there was reasonable suspicion to support the investigatory stop. The State also argues that the original purpose of the stop, to investigate illegal drug possession and trafficking by Huntley, was never deviated from during the duration of the stop. Thus, the fifteen-minute wait for the drug-detection dog did not unlawfully prolong the stop. Huntley responds that the district court correctly determined the stop was made without reasonable suspicion. However, at oral argument, Huntley conceded that the district court erred in deciding the stop was unlawfully prolonged.

For the reasons below, we hold the CI's tips, in combination with the detectives' partial corroboration, supplied reasonable suspicion to stop Huntley and investigate him for illegal drug possession and trafficking. We also hold that Huntley's stop was not unlawfully prolonged. Accordingly, we reverse the district court's decision and remand for further proceedings.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This guarantee is incorporated to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). "The Fourth Amendment 'protects people, not places[,]' and forbids 'not all searches and seizures, but unreasonable searches and seizures.' " *State v. Hobson*, 95 Idaho 920, 924, 523 P.2d 523, 527 (1974) (citations omitted).

In addition, Article I, Section 17, of the Idaho Constitution guarantees at least the same protection. *State v. Fees*, 140 Idaho 81, 88, 90 P.3d 306, 313 (2004). However, if a defendant merely mentions his rights under the Idaho Constitution without arguing below why those rights provide greater protection than the Federal Constitution, the question of whether there is greater protection is not properly preserved for appeal. *State v. Frederick*, 149 Idaho 509, 513, 236 P.3d 1269, 1273 (2010). Here, Huntley's motion to suppress mentioned his rights under Article I, Section 17, of the Idaho Constitution. However, Huntley never argued below why these rights are greater than those provided by the Fourth Amendment. Thus, we only address whether Huntley's rights under the Fourth Amendment were violated.

Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment generally may not be used against the victim of the violation. *Bishop*, 146 Idaho at 810–11, 203 P.3d at 1209–10; *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). When a defendant moves to exclude evidence under this rule, the government carries the burden of proving that the

warrantless search or seizure in question was reasonable. *State v. Anderson*, 140 Idaho 484, 486, 95 P.3d 635, 637 (2004). If reasonable, the search or seizure does not offend the defendant's Fourth Amendment guarantee. *Id.*

**A. The CI's tips, coupled with the detectives' partial corroboration, supplied reasonable suspicion to stop Huntley.**

On appeal, the State maintains reasonable suspicion existed to stop Huntley based on the tips alone, or, in the alternative, the tips plus corroboration of them in part. Specifically, the State argues the district court improperly discounted the presumed reliability of the CI's tips as required by *State v. Bishop*, 146 Idaho 804, 203 P.3d 1203 (2009) and incorrectly applied the probable cause standard instead of the reasonable suspicion standard. Huntley responds by echoing much of the district court's reasoning and arguing that the content of the tips is innocuous information, i.e., that the facts do not support reasonable suspicion. Huntley also argues, relying on *Nixon v. United States*, 870 A.2d 100, 104 (D.C. 2005), that, as a matter of law, a *paid* informant's tip is less reliable than one coming from a known citizen-informant without a financial interest. We agree with the State.

"Typically, seizures must be based on probable cause to be reasonable." *Bishop*, 146 Idaho at 811, 203 P.3d at 1210 (citing *Florida v. Royer*, 460 U.S. 491, 499–500 (1983)). "However, limited investigatory detentions, based on less than probable cause, are permissible when justified by an officer's reasonable articulable suspicion that a person has committed, or is about to commit, a crime." *Bishop*, 146 Idaho at 811, 203 P.3d at 1210. In other words, an officer may, without violating constitutional guarantees, make an investigatory stop of an individual if that officer has reasonable suspicion that criminal activity is underway." *Id.* (citing *Royer*, 460 U.S. at 498). "The quantity and quality of information necessary to establish reasonable suspicion is less than that necessary to establish probable cause." *Id.* (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)).

However, reasonable suspicion requires more than "a mere hunch or inchoate and unparticularized suspicion." *Bishop*, 146 Idaho at 811, 203 P.3d at 1210 (quotations omitted). "Whether an officer possessed reasonable suspicion is evaluated based on the totality of the circumstances known to the officer at or before the time of the stop." *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also State v. Pachosa*, 160 Idaho, 35, 39, 368 P.3d 655, 659 (2016).

5

In *Bishop*, we said that "[a]n informant's tip regarding suspected criminal activity may give rise to reasonable suspicion when it would 'warrant a man of reasonable caution in the belief that a stop was appropriate.' " 146 Idaho at 811–12, 203 P.3d at 1210–11 (citing *White*, 496 U.S. at 329). When a tip is involved, we still evaluate the totality of the circumstances, but the veracity, reliability, and basis of knowledge of the informant and their tip are "highly relevant" factors in determining whether reasonable suspicion exists. *Bishop*, 146 Idaho at 811–12, 203 P.3d at 1210–11. The tip must have "adequate indicia of reliability" to justify reasonable suspicion for a brief investigatory detention. *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)). "The more reliable the tip, the less information required to establish reasonable suspicion." *Bishop*, 146 Idaho at 811, 203 P.3d at 1210. If the tip lacks adequate indicia of reliability, the police typically must engage in corroboration of the tip, or further investigation, before they can establish reasonable suspicion for an investigatory stop. *Id.* at 812, 203 P.3d at 1211 (citing *Adams*, 407 U.S. at 147).

In Idaho, we generally recognize that there are two types of informants: anonymous versus known. *Bishop*, 146 Idaho at 812, 203 P.3d at 1211. First, an anonymous tip, that simply "provides a description of a suspect and alleges that he or she committed a crime[,]" generally will not give rise to reasonable suspicion without more (e.g., independent police corroboration). *Id.* Second, if the tip comes from a "known citizen-informant, the tip is generally sufficient to establish reasonable suspicion." *Id.* Unlike anonymous informants, a known informant's "reputation can be assessed, and if the informant is untruthful, he or she may be subject to criminal liability for making a false report." *Id.* From this, we held in *Bishop* that a tip from a known informant is "*presumed reliable* . . . . [and] independent police verification of such tips is generally *not* necessary." *Id.* (emphasis added); *see also State v. Van Dorne*, 139 Idaho 961, 965, 88 P.3d 780, 784 (Ct. App. 2004). Nevertheless, even in the face of presumed reliability, other surrounding circumstances stay relevant to the totality analysis. *Bishop*, 146 Idaho at 812, 203 P.3d at 1211.

A non-exhaustive list of factors under the totality analysis includes whether: (1) the informant reveals his or her identity; (2) the informant reveals the basis of his or her knowledge; (3) the location of the informant is known; (4) the information was based on personal knowledge of events as they occurred; (5) the information was subject to "immediate confirmation or corroboration by police"; (6) the informant has previously provided reliable information; (7) the

6

provided information is predictive; and (8) the informant could be held criminally liable if their provided information is false. *Id*. (citing *White*, 496 U.S. at 331–32).

Here, the district court's totality analysis erred in two major respects. It improperly required corroboration of the tip *before* treating it as reliable (contrary to *Bishop*'s known citizen-informant presumption); and it mistook the standard required for reasonable suspicion with that of probable cause:

> Here, based upon the totality of the circumstances, there are very few factors indicative of reliability. Law enforcement did know of the CI's identity and that he had provided reliable information in the past. But, in this circumstance, the only information the police could corroborate about the CI's report is Huntley's location and his vehicle. No other information available to police at this time gave rise to reasonable suspicion that a crime was occurring.
>
> Next, the detectives unreasonably prolonged Huntley's detention while they waited for the arrival of a drug dog. A warrant was not applied for in this case until the drug dog hit on the car. Until that point, there does not appear to be enough evidence in the record that would have supported the detectives' application for a search warrant of Huntley's home or car. The reliance on the drug dog hit indicates that the detectives needed a basis for the search warrant.
> . . . .
> Here, the State fails to meet its burden of proof as to the reasonableness of the original detention and any subsequent extension. There was no basis for Huntley's stop beyond the information received by the CI. If the CI's information was sufficient, the appropriate procedure would have been to have applied for a warrant based upon that information. Instead, the officers first attempted to search the car by asking Huntley for consent. When that was denied, they prolonged the detention until a drug dog arrived. Considering the totality of the circumstances, Huntley was inappropriately detained, with no basis to extend the detention until the drug dog arrived. Therefore, the Defendant's motion to suppress is granted.

As noted, the first problem with the district court's analysis is that it did not apply the known citizen-informant presumption we set out in *Bishop*. The CI here is a known citizen-informant—one that shared a reliable history with Detective Dammon. Thus, the CI's tips are entitled to a presumption of reliability under *Bishop*. However, the district court reversed the presumption because it treated the CI's tips as presumptively unreliable unless sufficiently corroborated. This is particularly apparent where the district court emphasized that the "only" information the detectives could corroborate was Huntley's location and his vehicle. Thus, the district court improperly discounted the CI's tips as if they came from an anonymous source—not a known citizen-informant.

Second, the district court conflated the level of proof sufficient for reasonable suspicion

with that required for probable cause. The district court reasoned the detectives should have waited for enough information from the CI to constitute probable cause for a warrant:

> There was no basis for Huntley's stop beyond the information received by the CI. If the CI's information was sufficient, the appropriate procedure would have been to have applied for a warrant based upon that information.

However, a tip may be insufficient to support probable cause but sufficient to support reasonable suspicion for a stop. *See White*, 496 U.S. at 330 (holding the same). "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams*, 407 U.S. at 147. The district court's analysis does not reflect this principle. Moreover, the above reasoning, coupled with the district court's added admonishment of the detectives for relying on the drug dog alert to supply probable cause, shows the district court improperly applied the heightened probable cause standard. Only reasonable suspicion that a crime was afoot was needed to stop Huntley, not probable cause.

In sum, the district court's analysis is unmoored from our decision in *Bishop*, and it applied the wrong standard of proof. Under our free review, we now apply our own totality analysis in light of the facts found by the district court and uncontroverted testimony from Detective Dammon.

Here, the district court found that the CI was a known, paid, confidential informant who had supplied reliable information to Detective Dammon in the past. Thus, we start with the presumption that the CI's tips as to Huntley were reliable. *See Bishop*, 146 Idaho at 812, 203 P.3d at 1211. Nevertheless, we must look at the totality of the circumstances before reaching a conclusion as to whether reasonable suspicion existed to stop Huntley.

To begin, the CI's accumulated tips include the following information. In early August 2019, the CI reported Huntley was "involved in the sales of methamphetamine and trafficking methamphetamines" from Washington into Idaho. The CI supplied Huntley's apartment address and reported that he had seen Huntley driving a blue station wagon. Detective Dammon testified the CI also reported "Huntley takes his drugs with him when he leaves [his] apartment." The CI reported that on August 8, 2019, (the night before the stop) Huntley had left the Lewiston-Clarkston area of Idaho and was believed to be picking up methamphetamine in Washington. Finally, later that same night, the CI reported personally observing Huntley "in possession of several ounces of methamphetamine" in Lewiston, Idaho. Contrary to Huntley's arguments on

8

appeal, these tips—taken together—are not innocuous.

That said, the CI's basis of knowledge for the above information is not entirely accounted for in the record. The CI reported personal knowledge of Huntley's blue station wagon and that Huntley was in possession of several ounces of methamphetamine in Lewiston, Idaho (the night before the stop). However, on both direct and cross examination, Detective Dammon could not recall how the CI came about the rest of the above information. Thus, the "basis of knowledge" factor contributes to the presumed reliability of the CI's tip yet detracts from it at the same time, i.e., the factor is a wash.

Next, only a minimal part of the information provided by the CI was subject to immediate confirmation or corroboration (e.g., Huntley's address). Furthermore, none of the information provided by the CI was predictive in any strict sense. For example, when the CI called Detective Dammon the night before the stop and reported seeing Huntley with "several ounces" of methamphetamine, the CI did not provide information predicting exactly where Huntley would be at a particular place, or time, with that methamphetamine.

Nevertheless, any defects in establishing reasonable suspicion based on the tips alone were cured when the detectives independently corroborated parts of the CI's tips. For example, prior to the stop, Detective Dammon confirmed that Huntley's registered residence matched the address the CI supplied. The three detectives also witnessed Huntley exit the apartment complex at that same address and enter a blue station wagon. This corroborated Huntley's vehicle and suspected location. Furthermore, the detectives witnessed Huntley leave his apartment carrying, among other things, a large silver case and placing it inside his vehicle before driving away. This is significant because the CI had reported seeing Huntley in possession of several ounces of methamphetamine the immediate night before. The CI had also informed Detective Dammon earlier in August that Huntley takes his "drugs" with him when he leaves his apartment. Thus, a person of reasonable caution would be warranted in the belief that the large silver case, taken from Huntley's apartment into his vehicle, may contain the several ounces of methamphetamine the CI witnessed the night before.

Accordingly, we hold, based on the totality of the circumstances, including the CI's tips, that the stop was supported by reasonable suspicion. The district court's decision to the contrary is reversed. Because of this, it unnecessary for us to discuss the State's alternative argument that the CI's tips alone were enough to supply reasonable suspicion for the stop.

9

In addition, we are unpersuaded by Huntley's paid informant argument. Huntley argued on appeal that a paid known citizen-informant is less reliable as a matter of law than an unpaid one. Yet, the district court did not explicitly rely on the CI's "paid" status in reaching its decision, nor did its analysis address any such distinction. Because of this, Huntley argues that it is "conceivable" the district court relied on this new distinction, and that *Nixon v. U.S.*, 870 A.2d 100, 104 (D.C. 2005) supports this Court adopting the same. This argument is unconvincing for two reasons.

First, a "paid informant" distinction apart from the "anonymous" versus "known" dichotomy is not clearly established or applied in the precedent relied upon in *Nixon* to claim the distinction exists. *See Nixon*, 870 A.2d at 104 (citing *Lawson v. United States*, 360 A.2d 38, 39–40 (D.C. 1976)).

Second, Huntley's argument ignores the point of the "anonymous" versus "known" distinctions in *Bishop*. Known citizen-informants enjoy a presumption of reliability because if their reports are false, they may be subject to criminal prosecution. *See Bishop*, 146 Idaho at 812, 203 P.3d at 1211. Moreover, their presumed reliability only exists by virtue of a *history* of credible and reliable tips. *Id*. The "paid" status of an informant does not affect whether they could be subject to criminal prosecution—nor does it invalidate the informant's history of reliable tips. Thus, the "paid" status of an informant is irrelevant to why we presume the known citizen-informant is reliable in the first place under *Bishop*. Instead, whether an informant is paid is appropriate fodder for cross-examination to show potential bias. *See State v. Spurr*, 115 Idaho 898, 900–01, 771 P.2d 916, 919 (Ct. App. 1989) (noting the same). Thus, we decline Huntley's invitation to craft a third category of reliability for "paid" informants distinct from our current "anonymous" versus "known" dichotomy under *Bishop*.

Finally, under our determination that reasonable suspicion did exist to stop Huntley and investigate him for drug trafficking, we emphasize the narrow scope of this decision. We only address issues preserved for, and argued on, appeal. *See State v. Neimeyer*, 169 Idaho 9, 14, 490 P.3d 9, 14 (2021). "[B]oth the issue and the party's position on the issue must be raised before the trial court for it to be properly preserved for appeal." *Id*. (quoting *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019)). In this case, the only issue raised before the trial court by the parties was whether the totality of the facts gave rise to reasonable suspicion to stop Huntley. Indeed, the parties agree that Huntley never argued that the *Terry* stop exception to the

10

warrant requirement was so "narrowly drawn" that it does not apply to justify his detention. *See Terry v. Ohio*, 392, U.S. 1, 27 (1968). Today, we decide the narrow question presented and hold that there was reasonable suspicion to believe that Huntley had methamphetamine in his possession at the time of the stop.

**B. The stop was not unlawfully extended because the detectives never deviated from the original purpose of the stop.**

The district court also concluded that "the detectives unreasonably prolonged Huntley's detention while they waited for the arrival of a drug dog." On appeal, the State argues "Huntley's temporary, fifteen-minute detention was reasonable and lasted no longer than necessary to effectuate the purpose of the stop." Although Huntley conceded at oral argument that the stop was not unlawfully prolonged, the district court's conclusion here was a second and independent basis for granting Huntley's motion to suppress. Thus, we decide the issue and reverse the district court.

To comply with the Fourth Amendment, an investigative detention must be a reasonable seizure, i.e., temporary, reasonable in scope, and last no longer than is necessary to effectuate the purpose of the stop. *State v. Linze*, 161 Idaho 605, 609, 389 P.3d 150, 154 (2016). It remains a reasonable seizure "while the officer diligently pursues the purpose of the stop, to which that reasonable suspicion is related." *Id*. However, if the officer "deviates" from the original purpose of the stop—prolonging (i.e., adding time to) the stop—the officer no longer has that original reasonable suspicion supporting his actions. *Id*. "This new seizure cannot piggy-back on the reasonableness of the original seizure." *Id*. Therefore, "unless some new reasonable suspicion or probable cause arises to justify the seizure's new purpose, a seized party's Fourth Amendment rights are violated" when an officer prolongs the stop by deviating from its original purpose (absent some established exception). *Id*. "The rule isn't concerned with when the officer deviates" from the original purpose of the stop, "it is concerned with the fact that the officer deviates from the original purpose of the stop at all." *Id*.

Here, the purpose of the stop was to investigate Huntley for possession and trafficking of methamphetamine. The detectives diligently pursued the purpose of the stop and did not deviate from the stop's original purpose at *any* point. Moreover, the fifteen-minute wait for the drug-detection dog was related to the purpose of the stop and lasted no longer than necessary to dispel or affirm the reasonable suspicion that Huntley possessed and was trafficking illicit drugs.

11

Therefore, we hold the stop of Huntley was not unlawfully prolonged and reverse the district court's decision to the contrary.

## IV. CONCLUSION

We reverse the district court's decision granting Huntley's motion to suppress and remand this case for further proceedings.

Chief Justice BEVAN, Justice MOELLER, and Justice Pro Tem SCHROEDER, CONCUR.


STEGNER, J., concurring in the result.

While I do not disagree with the majority's conclusion that the officers possessed reasonable suspicion to suspect Huntley had violated the laws of Idaho, I write separately to explain that had the issue been presented below, I would conclude law enforcement's seizure and search of Huntley nevertheless violated the Fourth Amendment's warrant requirement. The officers' conduct in this case leads me to the troubling conclusion that their reliance on the paid confidential informant ("CI") was an attempt to create a workaround to the Fourth Amendment's warrant requirement. Although I agree with the majority that the officers possessed reasonable suspicion to suspect Huntley, I do not believe reasonable suspicion constitutes an exception to the warrant requirement when time is not of the essence, as it was not here. Unfortunately, when invited by this Court to brief that issue, both Huntley and the State agreed that the issue had not been preserved and this Court should not consider it.[1] Because that issue is not properly before this Court, I am constrained to agree with the result reached by the majority.

The simplest and best solution would have been for the officers to seek a warrant from a disinterested magistrate utilizing the information provided to them by the purportedly reliable CI. Had the officers done so, I do not think we would now be discussing this case. Because the officers sought a way to sidestep the constitution, I am of the view that their behavior does not pass constitutional muster.

---

[1] Because both parties have acknowledged that whether reasonable suspicion constitutes an exception to the warrant requirement when time is not of the essence was neither raised nor decided below, this decision has not been resolved and does not constitute the law of the case. *See State v. Hawkins*, 155 Idaho 69, 72, 305 P.3d 513, 516 (2013).

12

I begin my analysis with the oft-repeated phrase that "[w]arrantless searches and seizures are *presumptively unreasonable* under the Fourth Amendment." *State v. Wulff*, 157 Idaho 416, 419, 337 P.3d 575, 578 (2014) (italics added). A search conducted without a warrant must fall within a well-recognized exception to the warrant requirement to overcome this presumption of unreasonableness. *Id.* "When a warrantless search or seizure is challenged by the defendant, the State bears the burden to show that a recognized exception to the warrant requirement is applicable." *Halen v. State*, 136 Idaho 829, 833, 41 P.3d 257, 261 (2002). The concept of *reasonable suspicion* as an exception to the warrant requirement draws its genesis from *Terry v. Ohio,* 392 U.S. 1 (1968). Without a warrant, law enforcement may conduct an exterior pat-down search for weapons if *reasonable suspicion* exists that a suspect is "armed and presently dangerous to the officer or others." *Id.*, 392 U.S. at 24; *see also State v. Bishop*, 146 Idaho 804, 818, 203 P.3d 1203, 1217 (2009). In *Terry*, the United States Supreme Court discussed unique circumstances faced by law enforcement officers "on the beat," which cannot practically be subjected to the warrant requirement. *Terry*, 392 U.S. at 20. The concept of "reasonable suspicion" was created in *Terry* because officers on the street are engaged in "necessarily swift action predicated upon the on-the-spot observations [by] the officer on the beat[.]" *Id.* at 20. It should be readily apparent to even the casual observer that the basis for the reasonable suspicion exception to the warrant requirement did not exist under these circumstances: the officers waited seventeen hours to seize Huntley.

*Terry's* framework was designed as a narrow exception to the warrant requirement to enable the officer on the scene who often needs to make split-second safety decisions:

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a *narrowly drawn authority* to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27 (italics added).

In my view, the officers' conduct in this case is not akin to a "stop and frisk" interaction as contemplated by *Terry*. *See id.* The information provided by the CI was not the type of information which would give rise to the police behavior sought to be justified in today's decision. Certainly, based on the CI's information, officers had no basis whatsoever to suspect that Huntley was presently armed or dangerous. There is not a scintilla of evidence to suggest the officers were fearful of Huntley. Furthermore, the officers were not making any split-second decision that could be characterized as "on-the-spot" or a justification of immediate action. In fact, the officers in this case had ample time to investigate Huntley and pursue a search warrant prior to seizing him in the manner they did. As noted, they had approximately 17 hours between the time they received the paid CI's information and the time they seized Huntley. This amount of time is the antithesis of a split-second safety decision with which officers on the beat are often faced.

If we were to countenance the police behavior in this case, it would eviscerate the need for a warrant. It would in essence do away with the presumption that warrantless searches are unreasonable. If the police receive information from a paid informant, they would then be allowed to seize an individual who is the subject of that informant notwithstanding the Fourth Amendment's warrant requirement. Not only would this be bad law, but it is also bad policy. Conferring this power on the police would be misguided because of the ripe potential for "informants" providing information regarding individuals they seek to have seized irrespective of whether the underlying conduct is criminal. *See, e.g.*, *State v. Guzman*, 122 Idaho 981, 998, 842 P.2d 660, 677 (1992) ("In addition to encouraging compliance with the constitutional requirement that no warrant shall issue but upon probable cause, it also lessens the chances that innocent citizens will have their homes broken into and ransacked by the police because of warrants issued upon incomplete or inaccurate information.").

Although akin to a *Terry* stop, the officers' detention and subsequent search of Huntley and his vehicle could have (and should have) been conducted with a warrant. The officers should have applied for a warrant using the paid CI's information as the basis for probable cause. *See, e.g.*, *State v. Guzman*, 122 Idaho 981, 984, 842 P.2d 660, 663 (1992); *Dunlap v. State*, 126 Idaho 901, 907, 894 P.2d 134, 140 (Ct. App. 1995). "[T]he Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police[.]'" *Katz v. United States*, 389 U.S. 347, 356 (1967) (quoting *Wong Sun v. United States*, 371 U.S.

471, 481–82 (1963)) (second and third alteration in original). The requirement of an impartial magistrate is especially important here, where the paid CI is "known" only to police officers—not the defendant, perhaps not the prosecutor, and certainly not the judge. A "paid" informant is both *de facto* and *de jure* an agent of the police. *See State v. LePage*, 102 Idaho 387, 392, 630 P.2d 674, 679 (1981) (holding that an informant who deliberately elicits incriminating statements from a criminal defendant post-indictment violates the Sixth Amendment because the informant is acting as an agent of the government); *see also United States v. Henry*, 447 U.S. 264, 274 (1980) (same).

Instead of obtaining a warrant, officers attempted to pressure Huntley to consent to the search of his car, which he lawfully declined. When that course of action failed, officers then waited fifteen minutes for a drug detection dog to sniff Huntley's vehicle which then alerted to the presence of contraband. Only at this point did officers "use[] the alert as probable cause to further detain Huntley while they applied for a search warrant." In my view, not applying for a warrant until after the drug dog alerted on Huntley's vehicle is evidence of the officers' strategy to avoid obtaining a warrant in the first place. Typically, a drug dog alert on a vehicle gives officers probable cause to search the vehicle without a warrant. *State v. Howard*, ___ Idaho ___, 496 P.3d 865, 869 (2021) ("A reliable drug dog's alert, standing alone, is sufficient to establish probable cause for a warrantless search of a car.").

Once the drug dog alerted, it would have been unnecessary under the Fourth Amendment to then obtain a search warrant. This begs the question: Why would officers who have validly established probable cause to search a suspect's vehicle by way of a drug-dog alert feel the need to apply for a search warrant before acting on the dog's alert? I believe the officers' decision to get a warrant *before* searching the vehicle but *after* the dog alerted demonstrates that the officers knew their investigation of Huntley was on thin constitutional ice. I would resist the State's efforts to create a new method to work around the Fourth Amendment. The reasonable suspicion doctrine created by *Terry* was intended to afford a police officer the legitimate authority to search a suspect for weapons when quick action was necessary. It was never intended or designed to give police the ability to avoid a review of their actions when ample time exists to engage a disinterested magistrate to gain approval for their action. In actuality, the police in this case seek to expand reasonable suspicion far beyond its intended purpose. I think the Court in *Terry* would be appalled at the effort to expand the holding in *Terry* to such lengths. In fact, the

15

Court in *Terry* explicitly noted that the authority it granted to officers to perform weapons frisks be "*narrowly* drawn." 392 U.S. 27 (italics added).

In conclusion, a search absent a warrant is presumptively unreasonable because "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry*, 392 U.S. at 20. The officers here chose not to obtain a warrant—even though it was far more than merely practicable. Moreover, they have not identified a well-established exception to the warrant requirement justifying their failure to obtain a warrant. They have instead attempted to dramatically expand "reasonable suspicion" to do away with the need to obtain a search warrant. "[I]n dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." *Id.* at 10. This interest must be balanced, however, against the individual's constitutional rights.

A *Terry* stop constitutes "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and [] is not to be undertaken lightly." *Id.* at 17. Our judicial system retains a "traditional responsibility to guard against police conduct which is over-bearing or harassing, or which trenches [sic] upon personal security without the objective evidentiary justification which the Constitution requires." *Id.* at 15. We cannot and should not allow the *Terry* stop exception to the warrant requirement to swallow the Fourth Amendment's prohibition on unreasonable searches and seizures. *See State v. Downing*, 163 Idaho 26, 32, 407 P.3d 1285, 1291 (2017) ("The [inevitable discovery] doctrine 'is not intended to swallow the exclusionary rule whole by substituting what the police should have done for what they really did.'" (quoting *State v. Holman*, 109 Idaho 382, 392, 707 P.2d 493, 503 (Ct. App. 1985)). Because the litigants have concluded that neither party preserved this issue for appeal, I reluctantly concur with the majority's result. However, under my conclusion that reasonable suspicion does not constitute an exception to the warrant requirement when time is not of the essence, I think that the officers' warrantless seizure and subsequent search of Huntley was both presumptively unreasonable (because they lacked a warrant) and actually unreasonable (because it was not based on any reasonable suspicion that Huntley posed a risk to the officers' or the public's safety). Their action should not be allowed to stand. Because that issue is regrettably not before this Court, I concur with the majority's result.