# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49270

STATE OF IDAHO, )
　) 
　Plaintiff-Respondent, ) Boise, June 2022 Term
　)
v. ) Opinion filed: March 7, 2023
　)
PATRICK TYLER MAAHS, ) Melanie Gagnepain, Clerk
　)
　Defendant-Appellant. )
　)

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Deborah A. Bail, District Judge.

The district court's decision denying motion to suppress is <u>reversed</u>, the judgment of conviction is <u>vacated</u>, and the case is <u>remanded.</u>

Thomas Monaghan Law, PLLC, Boise, for Appellant. Thomas Monaghan argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Justin R. Porter argued.

———————————

ZAHN, Justice.

Patrick Maahs appeals from the district court's order denying his motion to suppress. For the reasons stated below, we reverse the district court's decision, vacate Maahs's judgment of conviction, and remand the case.

## I.　FACTUAL AND PROCEDURAL BACKGROUND

On April 10, 2018, a teller working at CapEd Credit Union called the Boise Police Department to report a suspicious situation. The teller reported that a man came into the credit union, made a large cash deposit, exited the building, and then changed clothes in the parking lot. The man subsequently spoke with two other men in the parking lot. The teller reported that the men's behavior made credit union employees nervous.

Officers from the Boise Police Department responded to the credit union and detained one man in the parking lot. As the man in the parking lot was being detained, Officer Will Reimers

1

arrived at the scene and proceeded into the credit union without speaking to the officers in the parking lot. Reimers entered the foyer of the credit union but found that the interior doors were locked (it was after 5:00 p.m. and the doors were routinely locked at 5:00 p.m.). As he waited for an employee to unlock the doors, Reimers observed two men, Patrick Maahs and Jordon Korona, standing at the teller counter. Reimers was dressed in full police uniform. One of the men made eye contact with Reimers for what Reimers felt was a prolonged period before notifying the other man, who then turned to look at Reimers. After the men had a brief conversation, one left the counter and proceeded down a nearby hallway. About 30 seconds later, the other man followed. Upon entering the credit union, an employee informed Reimers that both men had gone into a bathroom, even though they were informed that it was a single person bathroom. Reimers took a position just behind a wall at the head of the hallway leading to the bathroom and called for backup.

Officer John Mathis responded to Reimers's request. Reimers shared the information he had gathered with Mathis and stated that the men were "acting kind of hinky" and that he was "[n]ot sure what we have, but I figured we'd detain them." While waiting for backup, Reimers also heard a toilet flush. The officers observed the bathroom door for several minutes before Maahs emerged from the bathroom. The officers' subsequent conduct forms the crux of this appeal.

Reimers and Mathis immediately confronted Maahs as he exited the bathroom. Reimers later testified that he gestured for Maahs to come toward him, but he was not sure if Maahs noticed his hand gesture. Reimers noted there was a door at the end of the hallway, immediately behind Maahs, after he exited the bathroom. At the same time, Mathis issued Maahs loud verbal commands to come toward the officers. Reimers did not observe Maahs reach for a weapon or take any other action consistent with him being armed. However, Reimers believed Maahs was looking for a way to escape because he backed away from officers and "looked around" toward the door behind him. Reimers testified that he had no prior information suggesting that Maahs and Korona were armed, acting violently or aggressively, or dangerous. Reimers observed Mathis draw his service weapon, point it at Maahs, and advance "pretty quickly" on Maahs after he exited the bathroom. Mathis ordered Maahs to sit on the ground. After Maahs complied, Mathis holstered his weapon and handcuffed Maahs.

Mathis later testified that he saw Maahs exit the bathroom "and [he] started going away from us towards another door." Mathis did not have any information that either Maahs or Korona was armed or dangerous. Mathis issued Maahs several verbal commands to "come over here."

2

Mathis testified that Maahs did not come toward Mathis but instead "put his hands up kind of pushed like no [sic] and turned away to go away." Mathis drew his weapon and ordered Maahs to the ground. After handcuffing Maahs, he conducted a pat-down search of Maahs's person for weapons. During the pat-down of Maahs, Mathis removed all the contents from Maahs's pockets, including a hard metal object that turned out to be a Camas County Sheriff's badge. Mathis then took Maahs, still in handcuffs, to his patrol car so that Maahs and Korona could be questioned separately.

The officers' actions were captured on their body cameras. The footage shows that the total time between Maahs emerging from the bathroom to Maahs sitting on the hallway floor with his hands on his head is roughly five to seven seconds. Within two seconds of Maahs leaving the bathroom, Mathis walked quickly toward Maahs with his hand on his holstered pistol and drew his gun roughly one second later while ordering Maahs to get down. When Maahs exited the bathroom, he was holding a cellphone to his right ear with his left hand, while his right hand remained visible at his side. As Mathis walked toward him, Maahs transferred his phone to his right hand, raised his left hand, and took approximately four steps backwards while looking behind him. Later, after locking Maahs in the back of his patrol vehicle, Mathis searched through the contents of Maahs's wallet.

Other officers looked in the bathroom, where they discovered plastic used for vacuum-seal bags, plastic baggies, "oddly twisted towels," and a receipt with handwritten numbers on the back. Mathis called dispatch and learned Maahs was on felony probation. An on-call felony probation officer arrived on scene and informed Maahs that he was being arrested on an active agent's warrant.

As the events inside the credit union were unfolding, one of the officers in the parking lot radioed for a drug detecting dog to be dispatched to the credit union. Upon its arrival, the drug dog alerted on the car driven by Maahs. Inside, officers found a loaded 12-gauge shotgun, two safes containing methamphetamine and cocaine, a scale, a vacuum sealer, and packaging material.

The State charged Maahs with trafficking in methamphetamine, unlawful possession of a firearm, concealment, alteration or destruction of evidence, possession of cocaine, and possession of drug paraphernalia. Maahs moved to suppress the evidence seized from the search of his car on the basis that officers had conducted a *de facto* arrest and that his seizure was unsupported by probable cause or reasonable suspicion.

3

The district court held a hearing on the motion, during which Reimers and Mathis testified, and their body camera footage was admitted. The district court then issued a written order denying the motion. The district court concluded that Maahs had not been arrested, but only subjected to an investigatory detention, or *Terry*[1] stop, supported by reasonable suspicion. The district court found that the officers did not draw their weapons until Maahs started looking as though "he was intending to flee and was ignoring their instructions." Therefore, the district court determined that the officers' tactics in detaining Maahs were reasonable under the circumstances because they were in a vulnerable situation and needed to act to protect themselves and the public.

Maahs entered a conditional guilty plea to trafficking in methamphetamine pursuant to Idaho Code section 37-2732B(a)(4)(C) and reserved his right to appeal the district court's decision denying his motion to suppress. All other charges against Maahs were dismissed pursuant to the plea agreement. Maahs timely appealed the denial of his suppression motion.

The Court of Appeals affirmed, holding that the district court properly concluded that "all of the activity considered as a whole justified the manner . . . of [Maahs's] detention." *State v. Maahs*, No. 47690, 2021 WL 3523469, at *2 (Idaho Ct. App. Aug. 11, 2021). Maahs filed a petition of review with this Court, arguing that the Court of Appeals decision conflicted with relevant precedent regarding *de facto* arrests. We granted review.

## II.    ISSUES ON APPEAL

1. On appeal, should this Court apply a de novo or clearly erroneous standard of review to the district court's factual findings?

2. Did the district court err in denying Maahs's motion to suppress?

## III.    ANALYSIS

### A. The clearly erroneous standard of review governs our review of the district court's factual findings.

Maahs argues that the ordinarily applied "clearly erroneous" standard of review should not apply in this case because this Court has the same evidence before it as the district court. Under *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996), he contends that this Court freely reviews and weighs the evidence akin to a trial court.

This Court ordinarily applies a bifurcated standard of review to district court decisions on suppression motions. *State v. Phipps*, 166 Idaho 1, 4, 454 P.3d 1084, 1087 (2019) (citation

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

omitted). "When a decision on a motion to suppress is challenged, the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *Id.* (quoting *State v. Mullins*, 164 Idaho 493, 496, 432 P.3d 42, 45 (2018)). This standard reflects deference to the special role of a trial court to weigh conflicting evidence and judge witnesses' credibility. *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018) (citing *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018)). A substantial evidence standard is synonymous with a clearly erroneous standard of review. *See State v. Peightal*, 122 Idaho 5, 7, 830 P.2d 516, 518 (1992).

We have departed from the clearly erroneous standard in unusual and limited circumstances where this Court has "exactly the same evidence before it as was considered by the district court[.]" *Andersen*, 164 Idaho at 312, 429 P.3d at 853. Under those circumstances, "this Court has determined that its role on appeal is to freely review the evidence and weigh the evidence in the same manner as the trial court would do." *Id.* (quoting *State v. Lankford*, 162 Idaho 477, 492, 399 P.3d 804, 819 (2017)). The rationale for this rule is that a trial court that has not heard witness testimony, but instead relies solely on the exhibits presented to the court, is in no better position to judge the weight and credibility of evidence than this Court. *Roby v. Roby*, 10 Idaho 139, 142, 77 P. 213, 214 (1904).

Here, the district court considered the preliminary hearing transcript and the responding officers' body camera footage. However, the district court also heard live testimony at the motion to suppress hearing and drew on that testimony in making its factual findings. As such, we do not have exactly the same evidence before us as the district court, and this case does not present the same unique and narrow circumstances as *Andersen*. Accordingly, we apply the usual standard of review and consider whether the district court's factual findings were clearly erroneous.

## B. The district court erred in denying Maahs's motion to suppress.

### 1. Officers had reasonable suspicion to detain Maahs.

Maahs contends that officers lacked reasonable suspicion to conduct an investigative detention because they acted on an inchoate hunch about criminal activity rather than articulable facts. He contends that the district court erred in giving weight to the officers' reliance on the tip from the bank teller that amounted to a hunch of criminal activity. Further, he contends that the district court did not consider circumstances that should have mitigated the officers' suspicion.

5

The State argues that the district court did not err because the following articulable facts supported the officers' determination that reasonable suspicion existed: (1) the tip from the bank tellers about three suspicious men; (2) the large cash deposit made by Maahs and Korona; (3) the locked interior doors of the credit union; (4) Maahs and Korona going into a one-person bathroom after seeing officers; (5) hearing the toilet flush as the men were inside the bathroom; and (6) Maahs's attempt to flee upon exiting the bathroom. The State contends that these facts, coupled with the officers' reasonable inferences drawn from those facts based on their training and experience, is sufficient to demonstrate reasonable suspicion of criminal activity.

Both the Fourth Amendment to the United States Constitution and Article I, section 17 of the Idaho Constitution provide that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV; Idaho Const. art. 17, § 17. A seizure for Fourth Amendment purposes may take the form of an arrest or an investigatory detention. *See State v. Pylican*, 167 Idaho 745, 750–51, 477 P.3d 180, 185–86 (2020). "For an arrest to be considered lawful, it must be based on probable cause." *State v. Bishop*, 146 Idaho 804, 816, 203 P.3d 1203, 1215 (2009) (citation omitted). "However, limited investigatory detentions, based on less than probable cause, are permissible when justified by an officer's reasonable articulable suspicion that a person has committed, or is about to commit, a crime." *State v. Huntley*, 170 Idaho 521, ___, 513 P.3d 1141, 1146 (2022) (quoting *Bishop*, 146 Idaho at 811, 203 P.3d at 1210). Officers need not have reasonable suspicion of a particular crime, only that "criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations and internal quotation marks omitted). Whether officers had reasonable suspicion to conduct an investigative detention depends on the totality of the circumstances known to an officer at the time of the stop. *State v. Danney*, 153 Idaho 405, 410, 283 P.3d 722, 727 (2012). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27 (citation omitted); *Bishop*, 146 Idaho at 811, 203 P.3d at 1210. Instead, reasonable suspicion must be founded on "specific, articulable facts and the rational inferences that can be drawn from those facts." *State v. Bonner*, 167 Idaho 88, 94, 467 P.3d 452, 458 (2020) (citation omitted). Law enforcement officers may take into account their "experience and law enforcement training in drawing inferences from facts gathered." *Danney*, 153 Idaho at 410, 283 P.3d at 727 (citation omitted). "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citations omitted).

6

The totality of the circumstances in this case demonstrate that officers had reasonable suspicion to detain Maahs. Reimers testified to several specific facts that aroused his suspicion that Maahs might be engaging in criminal activity. He relied on the information relayed to him from the teller's call to Boise Police, including that a man had made a large deposit, left the credit union, changed clothes in the parking lot, and began talking with two other men. Reimers observed Maahs and Korona notice his presence at the credit union, briefly confer with each other, and walk away one after the other down a hallway. Reimers then learned from a credit union employee that both men entered what they knew was a single-person bathroom. The men were in the bathroom for more than three minutes and, during that time, Reimers heard the toilet flush. Reimers testified that in his training and experience investigating drug crimes, bathrooms are a common place for people to dispose of contraband.

Maahs points to Reimers's comment to Mathis that something was "hinky" as evidence that Reimers was acting on nothing more than an inchoate hunch. If considered in a vacuum, Maahs would be correct. However, Reimers's comment, while informal, followed his recitation of specific facts to Mathis that caused him concern. When viewed in the context of the rest of his discussion with Mathis, Reimers's comment is simply an expression of his growing suspicion drawn from the above facts. In sum, the totality of the circumstances known to Reimers and Mathis before Maahs left the bathroom established reasonable suspicion to conduct an investigative detention.

Maahs argues that the district court failed to account for a variety of facts that should have dispelled the officers' suspicion of criminal activity, including that it was unlikely that Maahs would rob a credit union after depositing more than $8,000, and Maahs's surprise at seeing the officers once he exited the bathroom. However, law enforcement officers "need not rule out the possibility of innocent conduct" to have reasonable suspicion of criminal conduct. *State v. Perez*, 164 Idaho 626, 628, 434 P.3d 801, 803 (2019) (quoting *Navarette v. California*, 572 U.S. 393, 403 (2014)). Also, law enforcement is not required to have reasonable suspicion that specific crimes have been, or about to be, committed. *See State v. Perez-Jungo*, 156 Idaho 609, 615–16, 329 P.3d 391, 397–98 (Ct. App. 2014). *See also Bishop*, 146 Idaho at 811, 203 P.3d at 1210 (citing *Terry*, 392 U.S. at 19) (explaining an investigatory seizure is permissible if it is based on specific, articulable facts which justify suspicion that the detained person is, has been, or is about to be engaged in criminal activity) (remaining citation omitted). It is sufficient that officers have

reasonable suspicion that an individual is involved in some criminal activity. *Perez-Jungo*, 156 Idaho at 615, 329 P.3d at 397 (citations omitted). As such, the mitigating facts that Maahs highlights do not alter the analysis that officers had reasonable suspicion that he was engaging in some criminal activity.

Maahs also contends that the district court's finding that he attempted to flee is clearly erroneous in light of Mathis's body cam footage. We need not address this argument, however, because it is irrelevant to our analysis of reasonable suspicion. As discussed above, the totality of the remaining circumstances established reasonable suspicion that Maahs was engaged in criminal activity.

2. Maahs was arrested without probable cause.

Maahs argues that the district court erred in concluding that law enforcement conducted an investigative detention because the officers' conduct in seizing him exceeded the scope of a reasonable investigative detention. He argues that by drawing their weapons, handcuffing him, handling him in a rough physical manner, and placing him in the back of a police vehicle, officers conducted a *de facto* arrest, unsupported by probable cause. Further, as mentioned above, Maahs asserts that he was not merely frisked after being seized, but was also searched when officers emptied the contents of his pockets after handcuffing him and searched his wallet as he sat in the police car.

The State contends that Maahs's seizure did not exceed the scope of an investigative detention because the totality of the circumstances justified the officers' tactics in detaining Maahs. The State specifically points to the potential risk of harm to officers and credit union employees, Maahs's attempt to flee, and the need to remove Maahs to a location outside the building so the officers could investigate potential criminal activity. The State does not contend that officers possessed probable cause to arrest or search Maahs.

The district court concluded that Maahs's seizure did not exceed the scope of an investigative detention because the officers' conduct was reasonable under the circumstances. The district court stressed the officers' vulnerability to an attack from either Maahs or Korona and the need to protect civilian employees of the credit union. Further, the district court noted the commotion in the hallway after Maahs's detention, reasoning that Mathis was justified in handcuffing Maahs, removing him from the building, and placing him into the back of a police cruiser.

8

*a. Whether a seizure constitutes an arrest requires an assessment of the totality of the circumstances.*

This Court has not articulated a bright-line test for when a seizure crosses the line from an investigative detention to a full-fledged arrest. *State v. Buti*, 131 Idaho 793, 796, 964 P.2d 660, 663 (1998). "Instead, 'common sense and ordinary human experience must govern over rigid criteria.'" *Id.* (quoting *State v. Pannell*, 127 Idaho 420, 423, 901 P.2d 1321, 1324 (1995)). "An arrest is characterized as a full-scale seizure of the person requiring probable cause." *State v. Ferreira*, 133 Idaho 474, 479, 988 P.2d 700, 705 (Ct. App. 1999). In contrast, "[a]n investigative detention is characterized as a seizure of limited duration which, when supported by a reasonable suspicion of criminal activity, falls within a judicially created exception to the probable cause requirement." *Id.* A determination of whether a seizure amounts to an arrest is measured under the totality of the circumstances. *Buti*, 131 Idaho at 796–97, 964 P.2d at 663–64. *See also United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).

We recently stated that courts may consider a number of "important factors" when considering whether an arrest or an investigative detention has occurred, including "the seriousness of the crime, the location of the encounter, the length of the detention, the reasonableness of the officer's display of force, and the conduct of the suspect as the encounter unfolds." *Reagan v. Idaho Transp. Dep't*, 169 Idaho 689, 697, 502 P.3d 1027, 1035 (2021) (internal quotation marks omitted) (quoting *Ferreira*, 133 Idaho at 480, 988 P.2d at 706). We have also directed courts to consider "the duration of the invasion imposed by the additional restriction," and "the law enforcement purposes served." *State v. DuValt*, 131 Idaho 550, 554, 961 P.2d 641, 645 (1998) (citing *Pannell*, 127 Idaho at 423, 901 P.2d at 1324). *See also State v. Fields*, 168 Idaho 57, 65, 479 P.3d 450, 458 (Ct. App. 2020) (listing all seven factors). These illustrative factors can serve as guideposts, but ultimately, "common sense and ordinary human experience must govern over rigid criteria." *See Buti*, 131 Idaho at 796, 964 P.2d at 663 (citation omitted).

The United States Supreme Court articulated the proper purpose and lawful scope of an investigative detention under the Fourth Amendment:

> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed

should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Florida v. Royer*, 460 U.S. 491, 500 (1983) (citations omitted). The State carries the burden to demonstrate that a seizure it seeks to justify based on reasonable suspicion is sufficiently limited "in scope and duration to satisfy the conditions of an investigative seizure." *Id.*

Placing a suspect in handcuffs may convert an investigative detention to an arrest where law enforcement does not have a reason to believe that a suspect poses a "substantial risk of danger or flight." *Pannell*, 127 Idaho at 424, 901 P.2d at 1325. In *Pannell*, law enforcement officers stopped Pannell's vehicle after a reported domestic dispute. *Id.* at 421, 901 P.2d at 1322. Before pulling the vehicle over, dispatch informed the officers that Pannell was inebriated and that officers should be careful because weapons were involved. *See id.* The responding officers saw Pannell reach into the back seat of the vehicle. *Id.* Officers asked Pannell to step out of the vehicle and perform field sobriety tests. *Id.* Following the tests, officers determined that Pannell was likely unsafe to drive. *See id.* Based on this information, and the report of weapons being involved in the domestic dispute, officers determined that Pannell posed a danger to law enforcement personnel and others if officers did not take steps to prevent Pannell from accessing a weapon before they completed their investigation of the domestic dispute. *Id.* Consequently, officers frisked Pannell, handcuffed him, and placed him in the back of their patrol car to drive him back to the scene of the domestic disturbance. *Id.* Officers then searched Pannell's car, discovering three large bags of marijuana. *Id.* at 421–22, 901 P.2d at 1322–23.

Pannell moved to suppress evidence gleaned from the search of his vehicle, which the district court denied. *Id.* at 422, 901 P.2d at 1323. In denying Pannell's motion, the district court relied on *Michigan v. Long*, 463 U.S. 1032 (1983), which permits officers to search the passenger compartment of a vehicle incident to an investigative detention if they have reasonable suspicion that the suspect is dangerous and may gain immediate control of weapons. *See id.* at 422–23, 901 P.2d at 1323–24. This Court reversed the district court, concluding that *Long* was inapplicable because Pannell had been arrested, not just briefly detained for an investigation. *Id.* at 425, 901 P.2d at 1326. This Court reasoned that placing a suspect in handcuffs is a much greater level of intrusion than other tactics ordinarily associated with an investigative detention, and justifiable only when officers demonstrated a substantial risk of danger or flight. *Id.* at 424, 901 P.2d at 1325. This Court noted the circumstances surrounding Pannell's seizure: (1) officers knew Pannell was inebriated, but did not feel as though he was so inebriated as to be charged with driving under the

influence; (2) a pat-down search before Pannell was placed in handcuffs revealed no weapons; (3) there was only one suspect and three responding officers; and (4) officers decided to leave Pannell alone with only one officer while the others attended to different tasks. *Id.* at 424–25, 901 P.2d at 1325–26. Based on the totality of the circumstances, this Court held that the force used to seize Pannell exceeded the scope of an investigative detention and rose to the level of an arrest. *Id.*

Law enforcement may also exceed the permissible scope of an investigative detention when they use a weapon or other aggressive tactics to effectuate a stop in the absence of an adequate rationale to justify the use of such force. *See Edwards*, 761 F.3d at 982. Use of a weapon does not automatically convert an investigative detention into an arrest. *See, e.g.*, *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982) (explaining that "the use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection"). However, the use of a gun to detain a suspect—and the implicit threat of deadly force that comes along with it—is a much greater intrusion than that typically associated with an investigative detention. *See United States v. Serna-Barreto*, 842 F.2d 965, 967–68 (7th Cir. 1988) ("It would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an 'articulable suspicion' of engaging in criminal activity."). Accordingly, to fall within the scope of a constitutionally permissible investigatory detention, law enforcement must reasonably believe that the use of a gun is necessary for their protection. *Merritt*, 965 F.2d at 1273. *See also Edwards*, 761 F.3d at 981; *Pannell*, 127 Idaho at 424, 901 P.2d at 1325 (noting that the use of intrusive tactics during an investigatory detention are permissible when they are "a reasonable precaution for the officer's safety").

> b. *The totality of the circumstances indicate that Maahs was arrested.*

After considering the totality of the circumstances known to the officers, the display of force in detaining Maahs exceeded the scope of an investigatory detention. Two tactics, when viewed in combination, exceeded the means "reasonably available to verify or dispel the officer's suspicion" and therefore lead us to conclude that Maahs was arrested. *See Buti*, 131 Idaho at 796–98, 964 P.2d at 663–65.

> i.   Mathis's use of a firearm was unreasonable under the circumstances.

First, Mathis's use of a firearm was unreasonable under the circumstances. The officers admitted during their testimony that they had no information that either Maahs (or Korona) was armed, dangerous, or posed any risk of violence. They cited no facts supporting their assertion that

11

the extraordinary display of force in this case was warranted because the men in the bathroom could have been planning an ambush attack, and their conduct in the credit union belies their contention. They took no steps to evacuate the building or instruct credit union employees and customers to stay clear of the bathroom door. Indeed, mere moments before Maahs emerged from the bathroom Officer Reimers motioned a credit union employee toward him. Nor did the officers confer with each other about a threat while waiting for the men to leave the bathroom. This is significant because Reimers testified that if he believed that the men in the bathroom posed a threat to their safety, he would have discussed the potential threat with Mathis.

The State contends that cases from the Fifth and Tenth Circuits indicate that Mathis's use of force was reasonable. *See United States v. Sanders*, 994 F.2d 200 (5th Cir. 1993); *United States v. Maslanka*, 501 F.2d 208 (5th Cir. 1974); *United States v. Merritt*, 695 F.2d 1263 (10th Cir. 1982). The facts of those cases, however, are distinguishable from the facts in this case.

In *Sanders*, the officer responded to a report that an armed man wearing a tan jacket was acting suspiciously at a grocery store. *Sanders*, 994 F.2d at 201–02. As the officer approached the scene, he witnessed a man wearing a tan jacket turn and walk away after seeing the officer. *Id.* The tan jacket was large and covered the man's waistband. *Id.* The officer exited his vehicle, drew his weapon, and ordered the man to stop and get on the ground. *Id.* On appeal, Sanders argued, in part, that the officer exceeded the permissible scope of a *Terry* stop by holding him at gunpoint. *Id.* The Fifth Circuit Court of Appeals analyzed the issue as one of reasonableness under the specific circumstances of Sanders's case—"[t]he relevant inquiry is always one of reasonableness under the circumstances. The court must determine case by case whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely." *Id.* at 206–07 (citation omitted).

After reviewing the facts of Sanders's detention, the court concluded the officer acted reasonably when he drew his weapon. *Id.* at 207. The court relied on the officer's knowledge that Sanders was armed, that he was wearing clothes that could conceal a weapon, that he held a paper bag that appeared to contain an alcoholic beverage which suggested he could be under the influence of alcohol, that he turned and began walking away as the patrol car pulled up, and that the officer observed several other people standing nearby. *Id.* The court concluded these facts gave the officer reason to believe the suspect, who was armed, could be aggressive and the officer therefore had to act swiftly to preserve the status quo and avoid exacerbating the situation. *Id.*

12

In *Maslanka*, officers had discovered 18,000 pounds of marijuana in a rural area when they witnessed a vehicle approaching from a one-way dirt road. *Maslanka*, 501 F.2d at 210–11. Shortly after the vehicle came into view, it turned around and headed back to the highway. *Id.* An officer chased the vehicle for 5 miles at speeds around 100 miles per hour before it finally came to a stop. *Id.* at 211. The lone officer then approached the vehicle with his weapon drawn, ordered the driver out, and arrested him for eluding a police officer and speeding. *Id.* On appeal, the defendants alleged the officer lacked probable cause to arrest them. *Id.* at 212. The Fifth Circuit Court of Appeals concluded the arrest was supported by probable cause. *Id.* at 212–13. The court went on to state, in dicta contained in a footnote to its probable cause discussion, that the officer's use of a weapon as he approached the vehicle did not, at that point, convert the initial detention into an arrest. *Id.* at 213 n.10. The court concluded that the officer was entitled to "exhibit[] proper caution" because he was alone on a lonely highway, and he wished to speak to the driver of a car with three occupants who had just led him on a high-speed, five-mile chase. *Id.*

In *Merritt*, police approached a vehicle parked on a residential street and ordered the occupants out of the vehicle. *Merritt*, 695 F.2d at 1265–66. Two of the officers had shotguns and one of the shotguns was pointed at the occupants throughout the detention. *Id.* at 1267. The police were searching for a fugitive wanted for murder and had been informed he may be one of the people in the truck. *Id.* at 1265. Police searched the vehicle after the occupants got out of the vehicle and found a .22 caliber revolver under the driver's seat. *Id.* Merritt was subsequently indicted for being a felon in possession of a firearm. *Id.* Merritt filed a motion to suppress on the basis that police lacked sufficient justification to confront him and his companions in the truck. *Id.* The district court found that the police had violated Merritt's Fourth Amendment rights. *Id.* The United States took an interlocutory appeal of the decision. *Id.*

The Tenth Circuit Court of Appeals analyzed three issues on appeal, one of which was whether the police, due to the manner in which they confronted and detained Merritt and his companions, in fact arrested them without probable cause. *Id.* at 1267–68. The court noted the use of guns in connection with a stop is permissible where the police reasonably believe the guns are necessary for their protection. *Id.* at 1273. The court concluded several facts justified the officers' use of the shotguns to ensure their own protection: (1) that the officers were looking for a murder suspect who was reportedly armed and dangerous; (2) that earlier in the evening a search of the residence where the suspect had been staying revealed many weapons and ammunition, thus

13

confirming the report that the suspect was armed and dangerous; and (3) that the suspect had companions with him who could lend support in the event of a confrontation with law enforcement. *Id.* at 1272-74.

These cases are unpersuasive when compared to the facts of this case. The *Sanders* decision is distinguishable because Mathis had not received any information that Maahs was armed, nor did he identify any facts establishing that Maahs posed a risk of violence. Unlike the defendant in *Maslanka*, Maahs did not lead Mathis on a high-speed chase for five miles prior to his detention, and Mathis was not alone and confronting multiple individuals in a remote location. This case differs from *Merritt* because Maahs was not suspected of committing a violent crime, nor had Mathis been informed that Maahs was armed and dangerous. The cases cited by the State generally hold that officers are entitled to draw their weapons during an investigative detention if necessary to protect their personal safety or the safety of bystanders. The State, however, did not establish at the suppression hearing that either Mathis or Reimers reasonably believed their personal safety, or the personal safety of other nearby individuals were in danger. As a result, the referenced cases do not support the State's position that Mathis's use of the firearm was reasonable.

We also note that while the State argues that Mathis's use of the firearm was justified because of Mathis's belief that Maahs was attempting to flee, the State has not cited a case holding that, within the context of an investigative detention, it is reasonable to aim a firearm at a suspect solely to prevent him from fleeing. Additionally, the State contends that the use of the firearm was appropriate because Mathis had to pass by the closed bathroom door while a suspect was still inside the bathroom. Mathis, however, was not pointing his firearm at the bathroom, but instead at Maahs. Reimers was covering the bathroom and commanded the individual in the bathroom to come out while Mathis was dealing with Maahs. In sum, the State has failed to establish that Mathis's use of his firearm was reasonable in this case.

ii. Mathis's emptying of all contents from Maahs's pockets and searching of Maahs's wallet were unreasonable under the circumstances.

Second, Mathis's removal of all contents from Maahs's pockets and search of Maahs's wallet were unreasonable under the circumstances. Maahs argues that the district court's "finding" that Mathis conducted a frisk is not supported by the body cam footage, which shows that Mathis searched him after handcuffing him, conducting, in essence, a search incident to arrest. The State argues that Mathis appropriately conducted a pat-down for weapons. Further, the State contends

14

that even if Maahs was searched, Maahs has failed to provide adequate support to demonstrate that searching a suspect lends itself to the conclusion that an arrest has occurred.

Although Maahs argues that the district court's factual finding on this point was erroneous, the district court's determination that Maahs was frisked is a legal conclusion. In essence, Maahs argues that by removing the contents of his pockets, and later rifling through his wallet, officers exceeded the scope of a reasonable investigatory detention. The question is not what the body cam footage reveals, but instead whether Mathis's conduct was within the scope of a reasonable investigative detention or otherwise supported by the law. *State v. Holler*, 136 Idaho 287, 292, 32 P.3d 679, 684 (Ct. App. 2001). We therefore freely review the district court's legal conclusion that Maahs was frisked rather than searched. *See id.* at 291, 32 P.3d at 683.

An officer may conduct a pat-down search for weapons, also referred to as a "frisk," incident to an investigative detention if the officer has reasonable suspicion that the suspect may be armed and dangerous. *Terry*, 392 U.S. at 27. A pat-down search is limited to "the minimum intrusion necessary" to assure an officer that a suspect does not have a weapon. *State v. Lee*, 162 Idaho 642, 648, 402 P.3d 1095, 1101 (2017) (quoting *State v. Watson*, 143 Idaho 840, 845, 153 P.3d 1186, 1191 (Ct. App. 2007)). After an officer is satisfied that an object found on an individual's person is not a weapon, he lacks authority to continue invading a defendant's right to be free from police intrusion absent probable cause to arrest the person. *Id.*

While Mathis testified that the purpose of the initial search was "predominantly for a weapon pat search," he also stated that he felt a card in Maahs's pocket and "just took it out." In fact, while Mathis initially patted Maahs's pockets during the search, he proceeded to remove all the contents of each of Maahs's pockets. Mathis did not articulate any facts that established a reasonable suspicion that Maahs might be armed or dangerous and admitted on cross-examination that he had no information indicating that Maahs was armed or dangerous. Accordingly, Mathis's actions in removing all the contents of Maahs's pockets exceeded the scope of a reasonable investigatory stop. *See State v. Harrison*, 160 Idaho 649, 651–52, 377 P.3d 1112, 1114–15 (Ct. App. 2016).

The same is true of Mathis's later search of Maahs's wallet. While Maahs was seated in the back of the patrol vehicle, Mathis opened Maahs's wallet and removed and examined the contents of the wallet. This occurred prior to the search of Maahs's vehicle. Mathis's search of the contents of Maahs's wallet likewise exceeded the scope of a reasonable investigatory stop.

15

In sum, the State has not carried its burden to demonstrate that, under the totality of the circumstances, the seizure of Maahs was an investigative detention. The particular facts and circumstances of this case did not justify pulling a gun on Maahs, emptying his pockets of all contents, and searching his wallet. When considered together, these actions were not the least intrusive means necessary to dispel the officers' reasonable suspicion. As a result, the investigative methods employed exceeded the scope of a lawful investigative detention.

3. The items found in the car must be suppressed as fruit of the poisonous tree.

Given our determination, the State was required to demonstrate that probable cause existed to arrest Maahs and search his person. *See Royer*, 460 U.S. at 500; *Ferreira*, 133 Idaho at 479, 988 P.2d at 705. The State has not argued that probable cause supported the arrest. Accordingly, we hold that Maahs's warrantless arrest violated the Fourth Amendment.

Maahs argues that all evidence discovered in the car must be suppressed because it was obtained as a result of his unlawful arrest. The exclusionary rule bars the use of physical evidence and verbal statements obtained as a result of a Fourth Amendment violation. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). When determining whether evidence is obtained as a result of a Fourth Amendment violation—so called "fruit of a poisonous tree"—the Court must consider whether the evidence was discovered through the exploitation of the illegal actions by police or "instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 487–88.

"Where a defendant has moved to suppress evidence allegedly gained through unconstitutional police conduct . . . the defendant bears an initial burden of going forward with evidence to show a factual nexus between the illegality and the state's acquisition of the evidence." *State v. Kapelle*, 158 Idaho 121, 127, 344 P.3d 901, 907 (Ct. App. 2014). "This requires a prima facie showing that the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *State v. McBaine*, 144 Idaho 130, 133, 157 P.3d 1101, 1104 (Ct. App. 2007) (citations and internal quotation marks omitted). This burden does not require the defendant to prove that the State could not have discovered the evidence absent an illegal search, but instead, "the defendant need only show that, on the events that did take place, the discovery of the evidence was a product or result of the unlawful police conduct." *Id.* at 134, 157 P.3d at 1105. Once the defendant proves this factual nexus, the burden shifts to "the State to demonstrate the exception applicable to the fruit of the poisonous tree doctrine. . . ." *State v. Bills*, 166 Idaho 778, 782, 463 P.3d 412, 416 (Ct. App. 2020). There are three exceptions to the

16

exclusionary rule: independent origin, inevitable discovery, and attenuated basis. *Stuart v. State*, 136 Idaho 490, 495, 36 P.3d 1278, 1283 (2001).

In moving to suppress the evidence seized from his vehicle, Maahs thus bore the initial burden to show a factual nexus between the unlawful arrest and the evidence seized. Maahs argues that police only discovered the contraband in the car after the K-9 arrived and alerted on the car, which was well after Maahs had been unlawfully arrested and placed in the back of the patrol car. Maahs cites to body cam footage and police reports to establish that the K-9 officer arrived on scene approximately 27 minutes after Mathis encountered Maahs inside the credit union. The K-9 officer then spoke with officers on scene before running his K-9 around the car. Maahs argues that, had he not been unlawfully arrested, he would have been free to leave the scene before the K-9 officer arrived. The State does not respond to this argument or otherwise contend that an exception to the exclusionary rule applies.

This was sufficient evidence to satisfy Maahs's initial obligation. *See State v. Babb*, 136 Idaho 95, 99, 29 P.3d 406, 410 (Ct. App. 2001) (holding video surveillance showing defendant's detention and arrest can be sufficient to demonstrate a factual nexus between arrest and discovery of evidence). The burden then shifted to the State to demonstrate an exception to the exclusionary rule. *Bills*, 166 Idaho at 782, 463 P.3d at 416. The State has not asserted an exception applies, and we therefore hold that the exclusionary rule bars the use of the evidence found in the car following Maahs's unlawful arrest.

The dissent takes issue with Maahs not establishing that, if he had not been unlawfully arrested, he would have been permitted to leave prior to the K-9 alert that provided probable cause to search his vehicle. In essence, the dissent would require Maahs to establish that, but for his unlawful arrest, there is no set of facts—including a hypothetical set of facts—in which officers would have discovered the evidence. That is the not the standard our appellate courts have employed, however.

Our Court of Appeals has held that a defendant's initial burden of demonstrating a causal nexus does not require a showing based on hypotheticals: "By expressing the query as a 'but for' test, we do not imply that a defendant bears the burden to prove a negative—that the State would not or could not have discovered the evidence on any set of hypothetical circumstances that could have arisen absent the illegal search." *McBaine*, 144 Idaho at 134, 157 P.3d at 1105. Instead, "the defendant need only show that, *on the events that did take place*, the discovery of the evidence was

17

a product or result of the unlawful police conduct." *Id.* (emphasis added); *State v. Vivian*, 171 Idaho 79, ___, 518 P.3d 378, 382–83 (2022).

We agree with the Court of Appeals' reasoning and holding in *McBaine*. We have consistently held that the State "bears the ultimate burden of persuasion to prove that the challenged evidence is untainted," *Kapelle*, 158 Idaho at 127, 344 P.3d at 907, and "to demonstrate the exception applicable to the fruit of the poisonous tree doctrine," *Vivian*, 171 Idaho at ___, 518 P.3d at 383. In this case, the dissent would effectively place the burden on Maahs to prove that the evidence would not have been inevitably discovered. *State v. Downing*, 163 Idaho 26, 31, 407 P.3d 1285, 1290 (2017) (alteration and citations omitted) ("[T]he inevitable discovery doctrine asks courts to engage in a hypothetical finding into the lawful actions law enforcement would have inevitably taken in the absence of the unlawful avenue that led to the evidence."). This was not Maahs's burden, however. *See Vivian*, 171 Idaho at ___, 518 P.3d at 383.

The dissent relies on the Court of Appeal's decision in *State v. Keene*, 144 Idaho 915, 174 P.3d 885 (Ct. App. 2007), to support its position that Maahs has not met his initial burden of showing a causal nexus, but the circumstances in *Keene* differ from those present here. In *Keene*, an officer was dispatched to an R.V. park in response to a call from the park's host that the occupants of a brown Mercury Grand Marquis could be selling drugs. *Id.* at 917, 174 P.3d at 887. The officer witnessed a brown Mercury Grand Marquis with two occupants leaving the park as he arrived. *Id.*

The following night, the same officer responded to a call reporting that a vehicle was parked in front of an unoccupied house. *Id.* When he arrived, the officer saw that the vehicle was the same brown Mercury Grand Marquis he witnessed the previous night leaving the R.V. park. *Id.* The officer called narcotics officers to assist and then approached the vehicle. *Id.* The two occupants exited the vehicle and began speaking to the officer. *Id.* The passenger admitted to being at the R.V. park the previous night. *Id.* The defendant, who had exited the driver's side of the vehicle, provided her name and date of birth, returned to her car, locked it, and left the scene on foot. *Id.* At about the time the defendant was leaving, narcotics officers arrived and chased after the defendant. *Id.* After resisting, the defendant was handcuffed and brought back to the scene. *Id.* The officers called a drug detecting dog, which arrived about 10 minutes after the defendant had been handcuffed. *Id.* The dog alerted on the vehicle, and a subsequent search revealed drugs and drug paraphernalia. *Id.*

The defendant moved to suppress the evidence discovered in her vehicle, which the district court denied. *Id.* at 918, 174 P.3d at 888. On appeal, the defendant argued the district court erred in denying her motion to suppress because her detention became a *de facto* arrest unsupported by probable cause when she was handcuffed and brought back to the initial scene. *Id.* The Court of Appeals "assum[ed] *arguendo*" that the defendant was unlawfully detained. The Court of Appeals concluded that the defendant had not met her initial burden because "the police had justification to detain and search the vehicle that was totally independent of their contact with" the defendant. *Id.* at 919, 174 P.3d at 889. The passenger admitted to being at the R.V. park the night prior, the officer recognized the same brown Mercury Grand Marquis, and the incident the night before connected the vehicle and its occupants to potential drug activity. *Id.* "This individualized, specific information amounted to reasonable suspicion that [the passenger] was engaged in the illicit drug trade and that the car had recently been used to transport drugs." *Id.* The Court of Appeals concluded that the facts provided reasonable suspicion for officers to seize the vehicle itself, so even if the defendant "attempted to drive away rather than abandon her vehicle, the officer could have lawfully prevented her from doing so." *Id.* Further, the Court of Appeals concluded the 15 minutes between when the passenger voluntarily connected himself and the vehicle to potential drug activity and when the drug dog alerted did not exceed the time necessary to effectuate the purpose of the stop. *Id.*

Unlike in *Keene*, responding officers here did not possess reasonable suspicion that Maahs's vehicle was connected to criminal activity such that the vehicle itself was seized as part of the investigation. In other words, the State has neither argued, nor established, that prior to Maahs's arrest, they developed reasonable suspicion that his vehicle was involved in potential illegal activity. Rather, they developed that suspicion *after* his arrest when the drug dog alerted on his vehicle. It follows from Maahs's argument that had he not been illegally arrested, he would have been able to drive his vehicle away from the scene and the drug dog sniff would not have occurred. The State has offered no argument or evidence to establish otherwise. We therefore conclude that Maahs's argument that his *de facto* arrest prevented him from getting in his vehicle and driving away is enough to carry his initial burden.

The dissent's concern with the record tending to show that officers would have still been conducting a lawful investigative detention had they not unlawfully arrested Maahs is well-taken, but that was an inevitable discovery argument for the State to make. It may have been the case that

19

officers would have discovered the evidence seized had they not exceeded the scope of a lawful investigatory detention, but the State did not argue this point to the district court nor here on appeal.

The State could have argued that Maahs failed to meet his initial burden of showing a causal nexus, but it chose not to. The State also could have argued that one or more of the exceptions to the exclusionary rule applied in this case, but no such argument has been offered. We are left with Maahs's showing that officers seized evidence 27 minutes after he was initially confronted, and following a dog sniff which occurred after his unlawful arrest. This was sufficient to meet Maahs's initial burden to establish a nexus between the unlawful conduct and the seized evidence. Without any responsive argument from the State on this point, we cannot say that the State has met its burden "to prove that the challenged evidence is untainted[.]" *Kapelle*, 158 Idaho at 127, 344 P.3d at 907.

Accordingly, we hold that the district court erred in denying Maahs's motion to suppress because the items found in the car must be suppressed as fruit of the poisonous tree. As a result, we vacate Maahs's judgment of conviction and remand this case for further proceedings.

## IV.    CONCLUSION

For the reasons stated above, we reverse the district court's decision denying Maahs's motion to suppress. Maahs's judgment of conviction is vacated, and the case is remanded for further proceedings consistent with this opinion.

Justices STEGNER and MOELLER, **CONCUR**.


BRODY, J., dissenting.

I would affirm the district court's decision to deny Maahs's motion to suppress because Maahs has not demonstrated a causal nexus between the government conduct he contends was unconstitutional and the discovery of the drug evidence he seeks to suppress. The majority concludes that based on reasonable suspicion, Maahs *was not free to leave the bank with his vehicle* because he was lawfully detained. With that much I agree. However, the majority then concludes that Maahs *would have been free to leave the bank with his vehicle before the drug dog sniff*, because the manner of Maahs's detention involved officers pulling a gun on him, handcuffing him, emptying his pockets, and searching his wallet, i.e., the manner of his detention amounted to a de facto arrest. How can it be that Maahs was not free to leave the bank because he was lawfully detained—but also free to leave the bank with his vehicle before the sniff?

20

The *only* sense in which both propositions can be true is if the *duration* (contrary to the majority's focus on *manner*) of Maahs's detention was unreasonable, *i.e.*, if Maahs was lawfully detained—but would have been free to leave before the drug dog alerted on his vehicle because, at that point, the time necessary to effectuate the purpose of the detention was, or should have been, completed. Thus, the only factual nexus—or logical link—between Maahs's detention and the drug dog alert is *time.* Maahs never made a factual showing regarding time and never challenged the duration of his detention as unreasonable. Without this—and by improperly focusing on manner—Maahs has not met his initial burden to show a factual nexus between governmental conduct he contends was unconstitutional and the discovery of evidence in his vehicle. Thus, the evidence in his vehicle is not "tainted"—and the burden never shifted to the State to explain why the evidence (if it was "tainted") should nevertheless be admitted under, for example, the inevitable discovery doctrine. *See State v. Downing*, 163 Idaho 26, 31, 407 P.3d 1285, 1290 (2017). I respectfully dissent.

To suppress evidence allegedly gained through unconstitutional governmental conduct, "the defendant bears an *initial burden* of going forward with evidence to show a factual nexus between the illegality and the state's acquisition of the evidence." *State v. Vivian*, 171 Idaho 79, __, 518 P.3d 378, 382 (2022) (emphasis added) (quoting *State v. Kapelle*, 158 Idaho 121, 127, 344 P.3d 901, 907 (Ct. App. 2014)). To meet this burden, the defendant must make a "prima facie showing that the evidence sought to be suppressed would not have come to light *but for* the government's unconstitutional conduct." *Vivian*, 171 Idaho at __, 518 P.3d at 382 (emphasis added) (quoting *State v. McBaine*, 144 Idaho 130, 133, 157 P.3d 1101, 1104 (Ct. App. 2007)). In other words, the defendant must show that, "on the events that did take place, the discovery of the evidence was a *product or result of the unlawful police conduct*." *Vivian*, 171 Idaho at __, 518 P.3d at 382 (emphasis added) (quoting *McBaine*, 144 Idaho at 134, 157 P.3d at 1105)). "If a defendant fails to meet this burden, his motion to suppress necessarily fails." *State v. Thla Hum Lian*, 168 Idaho 211, 217, 481 P.3d 759, 765 (Ct. App. 2020).

Unconstitutional government conduct, as it relates to the permissive scope of an investigative detention under the Fourth Amendment, generally fits into two categories: (1) unreasonable duration, *see, e.g.*, *State v. Karst*, 170 Idaho 219, __, 509 P.3d 1148, 1156 (2022) (clarifying the extended-stop doctrine under *Rodriguez v. United States*, 575 U.S. 348 (2015)); *State v. Huntley*, 170 Idaho 521, __, 513 P.3d 1141, 1150 (2022) (holding that a fifteen-minute

21

wait for a K-9 unit was not unreasonable when the action was related to the purpose of the detention); and (2) unreasonable manner, *see, e.g.*, *State v. Johns*, 112 Idaho 873, 736 P.2 1327 (1987); *State v. Pannell*, 127 Idaho 420, 423, 901 P.2d 1321, 1324 (1995). While offending either category may require us to deem the detention a *de facto* arrest that requires probable cause, *United States v. Sharpe*, 470 U.S. 675, 684–86 (1985), the unreasonable manner of a detention will not always have a factual nexus—or causal link—to the evidence a defendant seeks to suppress.

The Court of Appeals' decision in *State v. Keene*, 144 Idaho 915, 174 P.3d 885 (Ct. App. 2007), is instructive on this point. In that case, after a K-9 alert supplied probable cause for a search of the defendant's vehicle, officers discovered methamphetamine and paraphernalia. *Id*. at 917, 174 P.3d at 887. Initially, the encounter between the officers and the defendant and her passenger, outside the defendant's vehicle, was consensual. *See id*. at 918, 174 P.3d at 888. During the encounter, the passenger admitted to being at an R.V. park the night before—the same R.V. park where "two people" in a vehicle matching defendant's vehicle were reportedly engaged in illicit drug activity. *Id*. at 917–19, 174 P.3d at 887–89. After the passenger made this admission, the defendant locked her vehicle, and walked away from the encounter. *Id*. Officers eventually "ran after" the defendant (who resisted), handcuffed her, and returned her to the scene of the initial encounter. *Id*. at 917, 174 P.3d at 887. A K-9 unit was requested, and roughly ten minutes after the defendant was handcuffed, the K-9 alerted on the defendant's vehicle. *Id*.

The defendant moved to suppress the evidence discovered in her vehicle by arguing that her "detention became a *de facto* arrest when she was handcuffed," and that it "was not supported by probable cause or reasonable suspicion that she was involved in criminal activity." *Id*. at 918, 174 P.3d at 888. The trial court disagreed and denied her motion. *Id*. On appeal, the Court of Appeals affirmed the trial court and rejected the defendant's argument because—"assuming *arguendo*" that the manner of her detention amounted to a *de facto* arrest without probable cause— there was no factual nexus between *that* illegality and the discovery of illicit drugs in her vehicle pursuant to the K-9 alert supplying probable cause. *Id*. (emphasis original).

Many reasons supported the Court of Appeals' decision in *Keene*. First, the search of the defendant's vehicle was not a product of information from the defendant while she was allegedly "in custody" or under "arrest." *Id*. at 919 ("The police did not gain any information from arresting [the defendant] that caused them to search the vehicle[.]" (alterations added)). Second, the defendant had already walked away from her vehicle before she was seized, thus, there was "no

22

way" the K-9 alert and ensuing search "resulted from an exploitation of the allegedly illegal arrest." *Id*. Third, if the defendant had "attempted to drive away rather than abandon her vehicle, the officer could have lawfully prevented her from doing so" because police had justification to detain the passenger and the vehicle on suspicion of illicit drug activity related to the R.V. park. *Id*. Finally, as to the duration of the detention, "the fifteen minutes between the consensual encounter" and the K-9 alert "did not exceed the time necessary to effectuate the purpose of the stop." *Id*. Thus, whether the use of handcuffs during the defendant's detention was so unreasonable in manner to effectively place her "in custody" was beside the point. That alleged illegality had no causal link to the timing of the K-9 alert and the discovery of evidence in her vehicle.

Here, like the defendant's complaint about handcuffs in *Keene*, Maahs complains that the manner of his detention—the use of a firearm, handcuffs, and a search of his pockets and wallet— was so unreasonable that he was effectively "in custody" or under "arrest" during his detention. Yet, for some of the same reasons provided in *Keene*, nothing about the manner of Maahs's detention has any causal or logical link to the K-9 alert, the search of his vehicle, and the evidence discovered therein. Like the search of the defendant's vehicle in *Keene*, the search of Maahs's vehicle was—in no conceivable way—a *product or result of* information obtained from Maahs while he was effectively "in custody" or under "arrest" during his otherwise lawful detention. It was a product of time—and Maahs never argued the timing of his detention was unreasonable.

To compare, the discovery of evidence within Maahs's vehicle *would* have a causal or logical link to the manner of his detention if the evidence was obtained as a product or result of: (1) his involuntary consent to a search after he was "in custody" based on the "surrounding circumstances," *see State v. Hansen*, 138 Idaho 791, 796, 69 P.3d 1052, 1057 (2003); (2) his incriminating statements during a "custodial" interrogation, *see United States v. Chamberlin*, 644 F.2d 1262 (9th Cir. 1980), *and see, e.g.*, *Johns*, 112 Idaho at 876, 736 P.2d at 1330 (addressing whether a detention amounted to a *de facto* arrest where the defendant sought to suppress his *statements* during the seizure); (3) a search of his pockets and wallet (supplying information that gives cause to search his vehicle) after he was "in custody," *see State v. Lee*, 162 Idaho 642, 649, 402 P.3d 1095, 1102 (2017) ("An officer may perform a warrantless search only incident to an arrest that is lawful."); (4) a protective *Terry* sweep of his vehicle's passenger compartment, *see Pannell*, 127 Idaho at 423–25, 901 P.2d at 1324–26 (holding this exception, as articulated in *Michigan v. Long*, 463 U.S. 1032 (1983), was not available to make the search of the defendant's

23

vehicle lawful because the manner of the investigatory detention amounted to a *de facto* arrest); or (5) transporting Maahs to a police station during his detention (as that manner of detention *would* affect the time he is detained), *see Dunaway v. New York*, 442 U.S. 200, 212 (1979) (concluding the defendant's seizure was not an investigatory detention but a *de facto* arrest when he was transported unwillingly to a police station, and subjected to a custodial interrogation).

Furthermore, if Maahs had attempted to drive away with his vehicle before the K-9 alerted, the on-scene officers could have lawfully prevented him from doing so because the officers had underlying justification to stop Maahs from leaving (based on reasonable suspicion) for the *time* necessary to effectuate the purpose of his detention. Although the officers in *Keene* had justification to detain the vehicle itself (unlike in this case) on top of the reasonable suspicion to detain the defendant and her passenger, the underlying principle from *Keene* applies: The manner of a detention does not always have a causal relationship to whether the individual, otherwise lawfully detained, would have been free to leave at a *time* early enough to avoid a K-9 alert.

The circumstances of Maahs's detention play this out. During his detention, two other individuals were also detained, and multiple officers were on-scene in an effort to confirm or dispel the suspicion of criminal activity as to all three, drug related or otherwise. This involved many actions: interviewing the detained individuals, checking their identification with dispatch, interviewing bank employees, investigating the bathroom in the bank, collecting the cash Maahs deposited, contacting Maahs's felony probation officer to check his supervised release status, and conducting a "field show-up" for the bank employees to identify the detained individuals. These actions take *time*. And Maahs has not made any factual showing or argument related to time so that we *could* determine whether the purpose of the underlying detention was, or should have been, completed before the K-9 alerted on his vehicle.

Nevertheless, even without this showing, the timing evidence that is in the record belies the majority's *finding* that Maahs "would have been free to leave the scene before the K-9 officer arrived." Contrary to the majority's underlying suggestion, "[i]n any investigative detention the individual is *not* free to leave[,]" *State v. Ferreira*, 133 Idaho 474, 480, 988 P.2d 700, 706 (Ct. App. 1999) (emphasis added)—for the *time* necessary "to effectuate the purpose of the stop[,]" *Huntley*, 170 Idaho at __, 513 P.3d at 1150. The record reflects that after the K-9 officer arrived on scene at 6:04 p.m., he briefly spoke to another officer before his K-9 alerted on Maahs's vehicle. At around that same time, Maahs was detained in the patrol vehicle, and on-scene officers were

24

still interviewing bank employees, collecting the cash deposited by Maahs, investigating the bank bathroom, and in the process of contacting Maahs's probation officer. Indeed, the record shows that Maahs's probation officer was not reached until 6:15 p.m. (eleven minutes after the K-9 officer arrived) and did not arrive on-scene until sometime between 6:45 p.m. and 7:00 p.m. (at least forty minutes after the K-9 officer arrived).

The district court found (albeit implicitly) that the K-9 alert occurred "[e]arlier" than the initial contact with Maahs's probation officer at 6:15 p.m.—and Maahs has not challenged this finding on appeal. Nor did Maahs show that he *should* have been able to leave with his vehicle *before* the K-9 alerted because his detention was unreasonable in duration. *See, e.g.*, *Sharpe*, 470 U.S. at 685 (explaining that *Terry* stops cannot "continu[e] indefinitely" but there is "no rigid time limitation"); *Karst*, 170 Idaho at __, 509 P.3d at 1156 (extended-stop doctrine under *Rodriguez v. United States*, 575 U.S. 348 (2015)). Thus, there is simply nothing to warrant the majority's adoption of Maahs's one-sentence assertion—which Maahs made without citation to the record or a supporting argument—that had the manner of his detention not been unreasonable, "the police would not have been able to stop him from leaving in the vehicle before the K-9's arrival."

In sum, I would conclude that Maahs did not meet his initial burden to show a factual nexus between unconstitutional governmental conduct and the evidence that he seeks to suppress; thus, "his motion to suppress necessarily fails." *Thla Hum Lian*, 168 Idaho at 217, 481 P.3d at 765.

Chief Justice BEVAN concurs in the dissent.